IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,       )
ex rel. THOMAS McARTOR,          )
                                 )
        Relator,                 )   **1 : 08-cv- 0 1 33 -SEB -TAB**
                                 )   No:_____
v.                               )
                                 )
ROLLS-ROYCE CORPORATION,         )
                                 )   Jury Trial Demanded
        Defendant.               )

## COMPLAINT

The United States of America on relation of Thomas McArtor complains against Defendant

Rolls-Royce Corporation as follows:

### INTRODUCTION

1.      Defendant Rolls-Royce Corporation ("RRC") is a manufacturer of aircraft engines

used in airplanes and helicopters. It manufactures many of its engines specially for United States

military aircrafts including, for example, the RQ-4A Global Hawk, the V-22 Osprey, the T-45

Goshawk, the P-3 Orion, the OH-58 Kiowa helicopter, the Kiowa Warrior helicopter, the MH-6

Little Bird helicopter and the C-130 Hercules transport. RRC is also a member of the Joint Strike

Fighter team. RRC manufactures these engines at its facility in Indianapolis, Indiana. Its revenues

at that facility exceed $1.5 billion per year.

2.      Manufacturing engines for military aircraft requires an extraordinarily high degree

of precision and care. The ability to consistently manufacture products to specification within very

narrow tolerances is a critical aspect of this business because even minor defects can cause

catastrophic engine failure, endangering lives and the aircrafts themselves. Accordingly, industry

standards require manufacturers to follow rigorous quality control procedures for all aspects of production; from the raw materials and parts used, through the process of assembly, and ultimately to testing the end products.

3.     Recognizing the vital role of quality control for aircraft engines and parts, the United States specifically includes quality control obligations in its purchase contracts with RRC. Indeed, RRC must tender a quality management plan governing all aspects of production and obtain the United States' approval of same as a condition of even receiving the contracts. Further, it must certify its continued adherence to the plan with every engine and spare part that it sells to the United States under the contracts.

4.     Relator, a former executive at RRC, is bringing this suit because RRC is knowingly violating its quality control undertakings in very significant and dangerous ways. Relator tried to stop this malfeasance by working within RRC, but the company's management refuses to spend the resources and production time needed to comply. Instead, they have caused RRC to mislead the U.S. about RRC's actual quality control practices and falsely certify the quality of the products RRC provides to its government customers.

5.     These frauds are unconscionable and they have already had terrible consequences. Engines manufactured since RRC began violating its approved quality management plan fail at an unusually high rate. This includes catastrophic failures. Indeed, nine helicopters containing the improperly-manufactured engines have failed in Iraq, resulting in the loss of American lives. Any defects which caused these failures could have been avoided if RRC had been complying with its quality control responsibilities.

6.     The False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, entitles the United States to several remedies for RRC's malfeasance. First, RRC has committed, and continues to commit,

fraud by falsely certifying compliance with its approved Plans on each engine and spare part it sells to the United States. Each false certification violated the FCA. Second, RRC obtained the contracts themselves by submitting Plans which it had ceased following and did not intend to follow in the future. These contracts are conceived in fraud, and all claims for payment pursuant to those contracts are "false claims" under the FCA.

7.     As a result of RRC's frauds, the United States purchased millions of dollars of critical aerospace goods that were not manufactured and tested in accordance with the agreed requirements and which were thus untrustworthy and defective. Relator seeks treble damages and penalties on behalf of the United States of America for all such purchases. Relator also brings a claim for retaliation in that he was threatened, suspended, and, ultimately, fired because of his efforts to bring RRC's misconduct to the attention of the government.

## PARTIES

8.     Relator Thomas McArtor is a quality control professional with over 20 years of experience in the aerospace industry. He has a Bachelor of Science Degree in Quality Control Engineering from Kennedy-Western University. From 1986 to 1994, McArtor was an Advanced Quality System Engineer for Parker Hannifin Aerospace Group. From 1994 until 2007 McArtor worked for RRC, its affiliates, and predecessors-in-interest serving as a Quality Assurance Manager, Regulatory Compliance Specialist, Senior Manager of Quality Assurance, as the Organizational Designated Airworthiness Representative Coordinator ("ODAR"). From these positions, McArtor has personal knowledge of RRC's quality assurance procedures and its failure to comply with them, as well as its practices with respect to returned and defective products, among other matters.

9. In 2007, Relator was forced out of RRC due to his investigation of and speaking out about the matters alleged herein. Currently, Mr. McArtor is employed as the Senior Quality Systems Engineer at Honda Aircraft Company, Inc. in Greensboro, North Carolina.

10. Defendant, RRC is a Delaware corporation with its principal place of business located in Indianapolis, Indiana. RRC operates a production facility in Indianapolis, Indiana that manufactures engines and spare parts for military and civilian aircraft. In 1995, Rolls Royce North America purchased Allison Engine Company. RRC is the resulting company and it became the successor in interest to Allison. RRC is the largest operating entity of Rolls Royce North America, with approximately 4,000 employees.

## JURISDICTION AND VENUE

11. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3730. Mr. McArtor has direct and independent knowledge of the information on which the allegations are based and he voluntarily provided the information to the Government before filing these claims. Further, this action is not based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or the news media.

12. Venue is proper pursuant to 31 U.S.C. § 3732. Defendant RRC transacts business in this judicial district and the claims are based on events that occurred in this judicial district.

# FACTS

## Quality Assurance Requirements
## For Government Contracts

13.    RRC's contracts with the United States Department of Defense ("DoD") require it to maintain and adhere to approved quality assurance procedures. See e.g. 48 C.F.R. §§ 52.246-1 through 52.246-24; 209.270; 246.202-4; 246.408-71, 252.246-7000.  These procedures govern inspection, testing, and other fundamental aspects of quality assurance in the aerospace industry.

14.    Regarding approval of the inspection system and the inspection of finished items, RRC's contracts specify as follows:

> The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements.  As part of the system, the Contractor shall prepare records evidencing all inspections made under the system and the outcome. These records shall be kept complete and made available to the Government during contract performance and for as long afterwards as the contract requires.

48 C.F.R. § 52.246-2.  Submitting the inspection system for approval constitutes a representation that RRC follows and intends to continue following the approved procedures in the performance of the contract.

15.    Additionally, due to the critical nature of the goods being supplied, RRC is required to maintain and follow quality assurance procedures that are certified as compliant with AS9100 *et seq*. ("AS9100"), a third party standard for quality assurance procedures.  See 48 C.F.R. § 46.311 (entitled "Higher-Level Contract Quality Requirement"); 48 C.F.R. § 52.246-11 (con taining corresponding contract clause).

16.     To obtain an AS9100 certification, a contractor or subcontractor such as RRC must have, *inter alia*, written quality assurance procedures, and must submit those procedures to the individual or entity providing the certification. Submission of the quality assurance procedures to the individual or entity providing the AS9100 certification constitutes a representation that the contractor or subcontractor follows and intends to continue following those procedures. The third party certifying the quality assurance program reviews these quality assurance procedures, as well as other information, and bases its certification on the representations.

## Contractor Certification Requirements

17.     For each product RRC sells the government, RRC is required to certify that the product was manufactured in accordance with all contractual requirements, including the quality assurance requirements. This is a condition precedent to shipping the product and demanding payment. This requirement is reflected in the Certification of Conformance which RRC was required to and did provide to the United States for each aircraft engine and part it sold:

> I certify that on _____ [date], RRC furnished the supplies or services called for by Contract No. _____ . . . in accordance with all applicable requirements. I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical identification (part number), and are in the quantity shown on this or on the attached acceptance document."

## RRC's Quality Management System

18.     RRC maintains detailed quality assurance procedures and processes. These are contained in its Global Quality Manual and Global Quality Procedures, which apply to all Rolls Royce businesses, and the Local Quality Manual and Local Operating Procedures, which apply to RRC. Collectively, these materials are referenced to as RRC's "Quality Management System" or

"QMS."

19.     On numerous occasions preceding and during McArtor's employment at RRC, RRC submitted its QMS for approval by DoD, and obtained such approval, to become eligible for DoD contracts and to maintain its eligibility for such contracts.  In addition, RRC submitted  its QMS in order to obtain its AS9100 certification in 2005, as described below.

20.     RRC's QMS has several components, each of which is also a requirement of AS9100 and related AS standards, including the following:

A.     First Article Inspections.  First Article Inspections are required whenever a new product, design, process or supplier is used.  First Article Inspections are used to substantiate that the first batch of product for a new item or following a change in the manufacture of an item already in production meets all contractual specifications–in other words, they confirm that the supplier or manufacturer correctly understands the specifications and can make the product properly (as opposed to whether the manufacturer has the ability to do so consistently).  First Article Inspections also validate the configuration of the parts and completed engines prior to sale to customers.

B.     Receiving Inspections.  These inspections confirm that materials and products from suppliers meet specifications on a consistent basis.

C.     Manufacturing Inspections.  These inspections confirm that materials and products manufactured and assembled by RRC are meeting specifications on a consistent basis.

D.     Quality Escape Investigations and Reports.  RRC is required to investigate reports that a part does not comply with specifications and then provide the results of the investigation to the customer.

21.     All of these components of the RRC Quality Management System are basic, well-known industry requirements for quality assurance procedures and quality management systems in general as well as in the aerospace industry.

### RRC's Knowing Violation of its Quality System

22.     In 2002-2003, a new management team was installed at RRC, including Steve Dwyer (the Chief Operating Officer) and Thomas Loehr (the Vice President of Finance). In 2004, William Kleiner became the Vice President of Quality.

23.     RRC tasked the new management team with cutting costs at the Indianapolis plant and reducing the amount of time needed to manufacture its engines. The new management determined that they could achieve both goals by restricting the quality control procedures. They were unconcerned with the fact that RRC was contractually obligated to follow those procedures when manufacturing products for its government customers. Indeed, when the supplier quality assurance personnel expressed concern and frustration that the company had ceased following proper procedures, new management took away their independence and placed them under control of the Procurement Group where they were subjected to increased financial management pressures.

24.     The new management team was well aware of the risks created by the quality control restriction but turned a blind eye. By way of example, in mid-2006, Relator attended a meeting of high-level RRC executives. When the Vice President of Operations, John Gallo, was asked by another executive to identify potential quality problem areas, he stated that new management's strategy was reducing late deliveries and then stated that he had no intention of identifying quality problem areas because he did not have the resources to fix any of the problems.

## First Article Inspection Violations

25.     As explained above, First Article Inspections are used to verify that a product can be manufactured to specifications whenever a new product is introduced, whenever there is a change in the design of an existing product or in the process used to manufacture it, or whenever a new supplier is used for parts or materials incorporated into the product. First Article Inspections are expressly required by RRC's QMS as well as AS 9100.

26.     Beginning in 2004, RRC abandoned conducting First Article Inspections on the vast majority of products it sells to the government. In addition, RRC ceased enforcing its requirement that its suppliers conduct First Article Inspections on the products they delivered to RRC and which were incorporated into the items RRC sold to the United States.

27.     RRC's failure to conduct and require First Article Inspections was particularly significant because the new management team pushed many, often simultaneous, changes in procedures and design in order to cut costs and manufacturing time. Indeed, new management created an organization labeled "Cost Reduction" and staffed it with 30-40 engineers. New management also modified the Source and Method Change Procedures to eliminate key steps necessary to insure the safety and proper function of newly designed products.

28.     These uninspected "cost saving" design changes (*i.e.*, shortcuts), increased the risk of nonconformities and the risk that even conforming product would not function properly. Indeed, the Cost Reduction engineers themselves complained about pressure to eliminate even further critical steps from the design change process.

29.     Rushing these changes through was particularly dangerous because aircraft and helicopter engines are extremely complex; numerous systems and subsystems interact with each

other such that design changes in one system can lead to unforseen failures in another. Introducing multiple changes simultaneously and without adequate testing leads to failures whose causes are extremely difficult to identify.

30.     By 2004, investigations of product failures had concluded that the Source and Method Change Procedure was a major quality system failure. These results were communicated to upper management, including the new Vice President of Quality, but as of August 2006 the new management team had not remedied this failure.

31.     RRC experienced numerous product failures caused by design or source changes that were not subject to First Article Inspections including the following documented major quality failures:

A.     Model 250 engine turbine shafts with torn splines.

B.     T56 engine diffusser with defective interface dimensions.

C.     T56 engine torquemeter failure.

D.     T56 engine parts that were missing cooling holes.

E.     T56 engine compressor wheels that were improperly heat-treated, leading to failure.

F.     JSF engine liftfan part produced with wrong material.

G.     Model 250 and T56 engine parts with material defects due to processing errors.

H.     T56 engine turbine wheels with cracks due to new supplier's inability to meet specifications.

I.     AE2100 engine gears with improper root radii.

**Manipulation of Supplier Certification to Eliminate Receiving Inspections**

32.     RRC's Quality Management System requires RRC to conduct receiving inspections for all products and materials it receives from its suppliers. The one exception to this requirement under the System is for items shipped to RRC by "certified suppliers" (an exception that is itself unusual in the industry).

33.     Prior to new management being installed at RRC, RRC employed a Receiving Inspection Manager, Receiving Inspection Quality Engineer and a group of receiving inspectors and had relatively few certified suppliers. New management decided that these positions could be cut, and costs thereby saved, simply by extending certification to more suppliers. However, the suppliers were not in fact qualified for certification pursuant to the terms of the Quality Management System or industry practices and RRC therefore manipulated the process to make them certified.

34.     Specifically, in 2004, RRC abandoned its previous standards for certification to dramatically increase the number of certified suppliers. RRC knew that these newly-certified suppliers had not suddenly increased the quality of their manufacturing processes or ability to deliver supplies that met specifications; rather, RRC's goal was to eliminate the receiving inspection requirement for the vast majority of products and supplies it receives.

35.     By artificially increasing the number of certified suppliers RRC was able to cut costs and time for manufacturing its engines  First, RRC virtually eliminated the receiving inspection department thereby lowering costs. Second, because a much lower volume of supplied material was rejected as non-conforming(due to decreased inspection and not decreased incidence of noncompliant supplies), RRC avoided the usual delays associated with the need to reject noncompliant supplies and obtain replacements.

11

36.     Even when severe supplier quality failures occurred, the consequences for suppliers were muted at best, and RRC was increasingly reluctant to de-decertify them.  For example, GTEC/Goodrich Pump and Engine Controls had a series of critical problems in late 2004.  One problem involved Goodrich's decision to change the source of its lubricant without conducting a First Article Inspection.  The new lubricant contained graphite particles which were too large and which clogged fuel engine screens.  This error caused several helicopter engine failures in Iraq.

37.     To make matters worse, Goodrich knew of the problem but failed to alert RRC.  RRC's Product Quality Team recommended de-certification of Goodrich, but new management rejected the recommendation.

## Investigation and Reporting of Quality Escapes

38.     RRC uses the term "quality escape" to refer to instances in which it ships products that do not conform to specifications or are otherwise defective.  RRC often learns of quality escapes through customer returns or from affiliated or independent maintenance centers, who perform maintenance and repairs for customers.

39.     Under RRC's Quality Management System, RRC must investigate all quality escapes.  Prior to late 2005, such investigations proceeded by assembling a Customer Issues Team ("CIT"), which would include customer liaisons, the ODAR Coordinator, technical experts, and employees from procurement, engineering and manufacturing.  In addition, in appropriate circumstances, RRC was required to conduct Major Quality Failure Investigations.

40.     RRC's failure to comply with its Quality Management System for engines and parts before they were shipped to customers led to large numbers of quality escapes reported to the company.  In late 2005 and early 2006, the new VP of Quality responded by watering down the

12

procedures for investigating quality escapes, replacing CITs with Product Problem Resolution ("PPR") teams -- whose participants were much more restricted than the CIT teams. The changes also included eliminating participation by the ODAR Coordinator (McArtor) and including only higher-up individuals (often officers of RRC) rather than the individuals with more technical expertise and more direct responsibility for production and design.

41.     The new VP of Quality also eliminated Major Quality Failure ("MQF") Investigations, even though those were still required by the Quality Management System. MQF Investigations were supposed to occur when certain thresholds were met relating to the cost of the quality escape, the impact on the customer or the product, and the system impact of the quality escape or the fix. McArtor had been the administrator of the MQF Review Board up until that time.

42.     The purpose and effect of these changes was to reduce the number of individuals that knew about quality escapes -- concentrating that knowledge among higher level executives and concealing the large number of quality escapes that RRC was experiencing due to its other quality assurance violations.

43.     The changes also were calculated to lessen RRC's financial burden to its customers due to the increased rate of quality escapes. Quality escape investigations were supposed to determine, *inter alia*, whether the escape requires correction (or whether the engine could function as is), whether there is a likelihood that the escape might exist in other engines supplied by RRC, and to determine the fix for the problem. Each quality escape is supposed to be recorded in a log and given a designated number.

44.     If RRC determines that a quality escape likely exists in engines beyond the one that has been reported as defective, RRC must report the quality escape to owners of the other engines.

13

If the quality escape threatens to impair engine function (including engine life), then RRC also must insure that repairs are made or accommodations made. Even if RRC determines that the quality escape has no impact on engine function, it must still inform its customers that it has shipped non-conforming product and reach a mutually-agreed upon "concession." These remedies are required by RRC's contracts.

45.    Contravening its approved Quality Management System and the AS9100 standards, RRC has decided not to investigate numerous quality escapes and has improperly placed other investigations in an indefinite "open" status.

46.    RRC has also violated its approved system and AS 9100 by adopting a designation known as "Records Only Material Review Board" (or "Records Only MRB"). Under a Records Only MRB, RRC does not report the quality escape to other buyers of the engine. In contrast to prior practice and the requirements of the Quality Management System, RRC now uses Records Only MRB's when it has reason to suspect that defects exist in other engines it has produced, beyond the engine in which the defect was specifically reported. This practice creates several problems, including:

A.    If a customer has a product that does not meet specifications, even if RRC determines that the product or part can function "as is," the approved system and ISO 9100 still entitle the customer to a "concession" in terms of price, service or some other consideration, to be negotiated between the parties.

B.    RRC's and customers' records regarding the product no longer accurately reflect the actual configuration of the product. Even if the product could function "as is" with one defect in isolation, that defect might interact with a second apparently minor

14

defect in dangerous ways; but, in analyzing the likely impact of the second defect, there would be no way to know that the product even had the first defect.

47.    Under a Records Only MRB, RRC does not report the quality escape to other buyers of the engine, and it does not place the documents regarding the investigation in the usual locations where government auditors would expect to find them.

48.    This violates the record keeping requirements in the QMS as well as other express record keeping requirements in RRC's contracts that.

49.    As a result, RRC has failed to give notification of quality escapes in numerous circumstances where RRC has reason to believe that the product defect exists in multiple engines. In addition, by violating the requirement to investigate quality escapes and to conclude investigations of quality escapes, RRC has effectively accomplished the same result – it does not notify the United States of quality escapes in similar engines so long as no investigation is conducted or concluded.

50.    The following are some recent examples of new management designating important quality escapes as Records Only MRB's and other instances in which it manipulated the quality control system to avoid informing customers of defective engines and parts:

A.    A large number of Model 250 engine turbine shafts (used on the Kiowa Warrior helicopter, among other aircraft) had "Case on Core" conditions that weaken the shaft. These conditions occurred because of a defect in the heat treating process, causing certain parts of the shafts to be exposed to extreme heat temperatures during manufacture when those were supposed to be protected.

B.    Splines (*i.e.*, grooves or threading that allow different parts to fit together) on a large number of Model 250 engine turbine shafts were defective. These conditions

occurred because the machine that made the splines was improperly maintained causing fretting to occur.

C.   In 2005, RRC management learned that RRC's production of titanium wheels were flawed, but did not issue a recall or inform customers. RRC management also learned that titanium wheels were damaged because they were cleaned with the wrong solution, but did not recall the wheels.

D.   In 2002, RRC management allowed engines used in the C130J aircraft to remain in the field without a recall even though the engines had thin wall casting and voids that could lead to cracks in the Prop Reduction Gearbox.

51.   RRC has a contractual duty to report defects to DoD. For example, 48 C.F.R. § 52.246-18(b)(3), which is incorporated into RRC's contracts, requires RRC to notify DoD or its agents of defects in supplies that have previously been inspected. RRC management, including the VP of Quality, knows that RRC has routinely failed to comply, and has no intention of complying in the future, with its duty to notify DoD of defects in its engines.

**Use of Defective Parts**

52.   RRC has used defective, returned or non-conforming parts in engines on numerous occasions, including, without limitation, the following.

A.   In September 2006, RRC management approved the use of compressor blades on the Global Hawk aircraft which had previously been designated as scrap for experimental use only because they had failed to meet specifications.

16

        B.      RRC's major quality failure files for 2004 contain at least five instances in which parts designated as scrap or experimental use (because they did not meet specifications) were in fact used to build production engines delivered to customers.

53.     RRC's QMS, as well as standard industry practices and AS9100, expressly forbid using parts that have been found to be nonconforming, unless the nonconformances have been properly dispositioned by authorized Material Review Board representatives and submitted to the Customer for a concession agreement. RRC did not follow this practice before using the above-described parts. Thus, the shipment of these products with non-conforming parts violated the contract requirements, RRC's express Certificate of Conformance, and its implied certifications of compliance with the inspection system and of conformity of the product

54.     In other instances RRC attempted to use improper parts but Relator prevented it. In September 2006, RRC's VP of Quality attempted to cause RRC to reuse an engine subassembly as new when it had been returned from a distributor. Such a use would have violated RRC's Returned Materials Procedure, a part of its QMS. McArtor stopped this violation from occurring and insisted that RRC process the subassembly through RRC's Returned Materials Procedure.

55.     Similarly, in September 2006, the VP of Quality attempted to direct RRC to ship engines that were suspected to contain defective compressor blades. The compressor blades had been designated as experimental because they had failed inspections. A production manager claimed the blades were only accidentally marked as experimental, but no process was proposed to reinspect the blades. McArtor thwarted this attempt and forced reinspection of the blades.

17

**Results of RRC's Malfesance**

56.     DoD does not readily share information on failure rates of equipment because of security concerns. McArtor is informed, however, that nine Kiowa helicopters have failed in Iraq under routine operations. These failures were in addition to the Quality Escapes described above.

57.     Information on commercial failures is more readily available from National Transportation and Safety Board ("NTSB") records. From NTSB records, McArtor is aware of approximately 38 engine failures in commercial engines manufactured by RRC in violation of the quality control system between 2003 and 2005.

**RRC's Manipulation of the AS Certification Process**

58.     RRC's violations of its QMS resulted in increased failures of T56 engines used on C130 aircraft. Due to this increase, in October of 2005, DoD required RRC to obtain a re-certification that its QMS was compliant with AS standards, including AS9100.

59.     AS auditors only spot-check compliance with the written Quality Management System. They rely in large part on truthful answers and complete document disclosures to make the certification decision.

60.     Knowing this, RRC chose to provide the auditor with only limited documentation, concealing the evidence showing that it was not complying with the System. This was evidence that the auditor expected to be disclosed if it existed. For example, RRC did not share the internal 2004 report which revealed its failure to conduct all required First Article Inspections, despite the expectation that such materials would be provided to the AS auditor.

61.     RRC's management, including the new VP of Quality, was well-aware of RRC's failure to comply with its own Quality Management System. RRC did not disclose its routine and

material noncompliance with its Quality Management System to the auditor.  RRC management

knew that its actual quality assurance procedures, as opposed to those described in its manuals, did

not comply with AS9100.

62.     Because of this concealment, the auditor identified only limited deficiencies (and

RRC did not even fully address these) and did not discover the true extent of RRC's violations.  As

a result, RRC received its new AS9100 certification in December 2005.

### VIOLATIONS OF 31 U.S.C. SECTION 3729 (a)(1) AND (a)(2)

63.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

64.     For each instance in which RRC shipped products to DoD, or shipped products to

contractors who were manufacturing or participating in the manufacture of aircraft for DoD RRC

expressly certified that its products complied with all contractual specifications. These certifications

were repeated when RRC sought payment.

65.     Similarly, by submitting the goods for acceptance under the contract, RRC impliedly

certified that it had produced the goods in accordance with its approved system and that it found the

products to be in conformity with its contractual obligations.

66.     Each such express and implied certification was false in that RRC had represented

to DoD or its agents that it had a Quality Management System in place which it complied with, when

in fact RRC management knew that it was routinely failing to comply with its Quality Management

System in material respects.  Accordingly each certification was a false claim for payment.

67.     In addition, RRC was only able to obtain and maintain its contracts with DoD

because, *inter alia*, it continued to represent to DoD that it followed its Quality Management System

and because its Quality Management System was certified under AS standards, including AS9100.

19

RRC obtained its AS certification in 2005 by falsely representing to the inspector making the certification that it complied with its Quality Management System when its management, including the new VP of Quality, knew that such was not the case.

68.     In addition, such certifications were false because RRC management, including the new VP of Quality, knew that its manufacturing and inspection systems were sufficiently unstable that large numbers of defective products were being manufactured.

69.     For each instance in which RRC shipped product to DoD, or shipped products to contractors who were manufacturing or participating in the manufacture of aircraft for DoD, and each RRC request for payment of same, RRC knowingly caused a claim to be presented to DoD or its agents within the meaning of 31 U.S.C. § 3729(a)(1).

70.     For each instance in which RRC shipped product to DoD, or shipped products to contractors who were manufacturing or participating in the manufacture of aircraft for DoD, and each RRC request for payment of same, RRC knew that its certifications would be used to get payment within the meaning of 31 U.S.C. § 3729(a)(2).

71.     For each instance in which RRC shipped product to DoD, or shipped products to contractors who were manufacturing or participating in the manufacture of aircraft for DoD, and each RRC request for payment of same, RRC knew or recklessly failed to discover that it was not entitled to payment because its products did not meet specifications.  RRC therefore knew that its claims for payment were false or fraudulent within the meaning of 31 U.S.C. § 3729(a)(1).

72.     For each instance in which RRC shipped product to DoD, or to contractors that were manufacturing or participating in the manufacture of aircraft for DoD, and each RRC request for payment of same, RRC knew or recklessly failed to discovery that its certifications accompanying

20

its claims for payment were false within the meaning of 31 U.S.C. § (a)(2).

## COUNT I: FRAUD IN THE INDUCEMENT
## VIOLATIONS OF 31 U.S.C. §§ 3729(a)(1) AND (a)(2)

73.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

74.     By representing to DoD that it had a Quality Management System and that it materially complied with its Quality Management System, when its management (including the new VP of Quality) knew that RRC did not comply with the Quality Management System, RRC fraudulently induced DoD or its agents to enter into contracts for the supply of engines and other products to military aircraft and helicopters.  Each claim for payment for each aircraft engine sold under the contracts is a false claim as a result.

75.     Further, in late 2005, DoD required RRC to obtain re-certification of compliance with AS9100 as a condition of not keeping its contracts.  By representing to the AS9100 inspector that it had a Quality Management System and that it materially complied with its Quality Management System, when its management knew that RRC did not comply with the Quality Management System, RRC fraudulently obtained its AS9100 re-certification in December 2005, thereby fraudulently inducing DoD and its agents to continue with existing contracts with RRC and to enter into new contracts with RRC for the supply of engines and other products for military aircraft and helicopters.

76.     RRC was able to retain its contracts only as a result of this fraud.  Each claim for payment for each aircraft engine sold under the contracts is a false claim as a result.

77.     RRC is liable in this action on each claim presented to DoD or its agents for payment for each product RRC shipped to DoD or to contractors who were manufacturing or participating in

the manufacture of aircraft for DoD, for which it sought payment. For each such claim, RRC must pay a penalty of $11,000 together with treble the amount of payment received.

## COUNT II: FALSE AND FRAUDULENT STATEMENTS AND CERTIFICATIONS, VIOLATIONS OF 31 U.S.C. §§ 3729(a)(1) AND (a)(2)

78.   Relator incorporates each paragraph of this Complaint as if fully set forth herein.

79.   Each time that RRC shipped products to DoD or its agents, RRC fraudulently certified, both expressly and impliedly, that its products met all contractual requirements and that they were inspected in accordance with the approved quality assurance system and found to be conforming. These certifications were false in that RRC (including the VP of Quality) routinely and materially failed to comply with its Quality Management System. These certifications were reckless in that RRC knew that its manufacturing processes and quality assurance programs were not adequate and that it had a history of shipping defective products such that significant numbers of engines and other products were defective and not in compliance with contract specifications.

80.   RRC's failure to maintain its records in accordance with the contractual requirements and the plan while simultaneously presenting its records to the government for inspection, similarly was false and misleading and made to keep its contracts with the United States.

81.   RRC's fraudulent conduct violated 31 U.S.C. §§ 3729(a)(1) and (a)(2).

82.   RRC is liable in this action on each claim presented to DoD or its agents for payment for each product RRC shipped to DoD or to contractors who were manufacturing or participating in the manufacture of aircraft for DoD, for which it sought payment. For each such claim, RRC must pay a penalty of $11,000 together with treble the amount of payment received.

22

## COUNT III: REVERSE FALSE CLAIMS, VIOLATIONS OF 31 U.S.C. § 3229(a)(7)

83.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

84.     By violating its record keeping obligations and undertakings, such that the government auditors would not discover RRC's violations, RRC concealed from the government the fact that the government was entitled to refunds and/or accommodations on defective and non-conforming products RRC sold it.

85.     RRC's fraudulent conduct violated 31 U.S.C. § 3729(a)(7).  RRc is liable for treble the amount of the concealed refunds and concessions as well as a penbality of $11,000 for each record keeping violation.

## COUNT IV: RETALIATORY DISCHARGE
## VIOLATIONS OF 31 U.S.C. § 3730(h)

86.     Relator incorporates each paragraph of this Complaint as if fully set forth herein.

87.     In the Spring and Summer of 2006, Relator was repeatedly threatened by the VP of Quality with adverse action with respect to his employment because of his investigation of the facts alleged described herein, including the violations of 31 U.S.C. § 3729 alleged herein.

88.     In September 2006, RRC suspended Relator because of his investigation of these same facts.  In January 2007, RRC terminated Relator's employment because of his investigation of these facts.

89.     Under 31 U.S.C. § 3730(h), RRC is liable to McArtor for two (2) times his back pay plus interest and special damages, including but not limited to attorneys' fees and litigation costs.

WHEREFORE, Relator Thomas McArtor respectfully requests:

A.      Judgment in favor of the United States of America and against RRC in the amount of $11,000 for each claim for payment that RRC has sought from DoD together with treble the amount of payment received and other damages;

B.      Judgment awarding Relator up to 30% of any recovery;

C.      Judgment in Relator's favor and against RRC for two times his back pay plus interest, as well as all other compensatory and punitive damages;

D.      Judgment awarding him attorneys' fees and other litigation costs; and

E.      Such further relief as this Court deems proper.

## JURY DEMAND

The United States of America on relation to Thomas McArtor hereby demands trial by jury on all issues so triable.

UNITED STATES OF AMERICA ex rel.
THOMAS McCARTOR

By: _____

Counsel for Relator Thomas McArtor

Richard A. Waples
WAPLES & HANGER
410 North Audubon Road
Indianapolis, Indiana 46219
TEL: (317) 357-0903
FAX: (317) 357-0275
EMAIL: Richwaples@aol.com

Arthur Loevy
Michael Kanovitz
Jon Loevy
Bradley Block
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

25