**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* THOMAS McARTOR and <br> KEITH RAMSEY, <br><br>        Relators/Plaintiffs, <br>    v. <br><br> ROLLS-ROYCE CORPORATION, <br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1:08 Civ. 0133-WTL-DML |

**ROLLS-ROYCE CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO DISMISS THE AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER
JURISDICTION AND FAILURE TO STATE A CLAIM**

Rolls-Royce Corporation ("Rolls-Royce") respectfully submits this memorandum in support of its motion to dismiss Count I of the Second Amended Complaint (Dkt. 75; "SAC") on two grounds: (1) there is no subject matter jurisdiction over Relator Ramsey's claims under the "first to file" rule in 31 U.S.C. 3730(b)(5), *see* Fed. R. Civ. P. 12(b)(1); and, regardless, (2) no claim is set forth with the requisite particularity under Fed.R.Civ.P. 9(b), *see* Fed. R. Civ. P. 12(b)(6).

December 9, 2011

Peter A. Morse, Jr. (IN 17474-49)
Richard P. Winegardner (IN 17125-49)
Jeff M. Barron (IN 27730-49; IL 6269374)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, Indiana 46204
Telephone: (317) 231-1313
Facsimile: (317) 231-7433
pmorse@btlaw.com
rwinegardner@btlaw.com
jbarron@btlaw.com

**ATTORNEYS FOR ROLLS-ROYCE CORPORATION**

## I.    INTRODUCTION

Relators Ramsey and McArtor present themselves as False Claims Act (FCA) whistleblowers with personal knowledge of an alleged scheme by Rolls-Royce to submit "false claims" in an attempt to defraud the Government.  SAC at ¶¶ 34-36, 45, 131-147.  They assert that Rolls-Royce certified its quality systems under the "AS9100 higher-level quality requirements" and "tout[ed] its purported adherence" to that standard so it could induce the Government into entering "approximately" 180 contracts but, as their story goes, Rolls-Royce never intended to comply with the "AS9100" standard—and thus every one of those "approximately" 180 contracts was procured by fraud.  *Id.* at ¶¶ 34 & 35; *see also id.* at 45-47, 131-147.

This is an implausible tale, for it requires Rolls-Royce to have perpetrated a multi-year scheme against numerous third-party auditors, savvy Government negotiators, and the Defense Contract Management Agency ("DCMA")—the Government agency which oversees Rolls-Royce's quality operations from offices ***inside of*** Rolls-Royce's facilities.  Moreover, Relators' claims require Rolls-Royce to have carried out these intricate deceptions not just once, not just twice, but repeatedly and continuously over the course of "approximately" 180 contract negotiations.

Apart from the fact that these allegations lack credibility, the law demands that such an extraordinary claim of fraud be plead with particularity under Rule 9(b).  *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003).  Yet held up against the applicable standard, Relators' claims fall woefully short.  Indeed, absent are any of the particulars one would expect from a person with personal knowledge of such a far-reaching fraud.  Relators do not identify who was involved in the decision to embark on the alleged scheme and do not claim

to have been involved in any of the contract negotiations in which the Government was allegedly fraudulently induced.  They provide no details concerning any false statement which may have been conveyed to the Government – *i.e.* what was said, who said it, and when – or about any false claims that were actually submitted for payment.  Relators are not even familiar the terms the contracts they assert were fraudulently induced.  In fact, ***not one*** of the "example" contracts cited by Relators incorporated the "AS9100 standard," which allegedly caused the Government to sign the contracts, and ***none*** of Relators' samples requires the certificates of conformance that were purportedly a condition precedent to Government payment.[1]  Nor do Relators quote any part of the AS9100 standard or the written quality procedures that Rolls-Royce purportedly violated; the Second Amended Complaint recites only interpretations and speculations concerning these alleged terms.  *See, e.g.,* SAC at ¶¶ 35-45.

These gaps, omissions and errors fail Rule 9(b)'s standards and undermine Relators' status as plausible whistleblowers under the FCA.  Moreover, Ramsey's inexplicable delay in "blowing the whistle" until after McArtor's complaint had been unsealed – a full five years after Ramsey left Rolls-Royce and well after the Department of Justice ("DOJ") had concluded a 34-month investigation and decided it would not intervene in this case – reveals the conduct of an opportunist, not a whistleblower.  The FCA rightfully demands that such opportunistic claims be dismissed under the first-to-file rule.  *See* 31 U.S.C. § 3730(b)(5).

In sum, the first-to-file rule, Rule 9(b) and Rule 12(b)(6) all demand that Count I of the Second Amended Complaint be dismissed.  McArtor has now had three bites at the apple and Ramsey two, but they still fail to allege a plausible and detailed claim of fraud or overcome the

---

[1] The Court can and should consider the content of these contracts on a motion to dismiss. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

insurmountable first-to-file barrier as it relates to Ramsey.   Accordingly, all claims in Count I

should be dismissed for failure to plead a claim.[2]

## II.   PROCEDURAL BACKGROUND

The purpose of the False Claims Act is to encourage whistleblowers to come forward

early to expose (and stop) fraud on the Government.   Accordingly, the FCA gives relators a

considerable incentive:   they are entitled to up to a 30% cut of whatever the Government

recovers.   31 U.S.C. § 3730(d).   Here, Relators allege that their FCA claims encompass

"approximately 180" contracts.

### A.   The Original Complaint

Prior to his termination for performance deficiencies in 2007, McArtor was one of

approximately 20 Organizational Designated Airworthiness Representatives (ODARs) for the

Federal Aviation Administration (FAA) who worked at Rolls-Royce's Indianapolis facility.[3]   In

the late summer of 2006, McArtor demanded that Rolls-Royce cease all production activities due

to purported quality concerns.   SAC at ¶ 116.   Quality experts at Rolls-Royce, however,

disagreed with his conclusion and, in response, McArtor complained to both the FAA and the

DCMA, purportedly giving them all of the details that he now alleges before this Court. SAC at

¶¶ 117, 126.[4]

The FAA and DCMA likewise did not agree with McArtor's assessment.   Consequently,

McArtor changed course, and submitted his allegations to the Department of Justice ("DOJ") and

---

[2] Rolls-Royce is answering McArtor's meritless retaliatory discharge claims in Counts II and III.

[3] ODARs are Rolls-Royce employees.

[4] McArtor also filed additional complaints with the EEOC and DOL, asserting that he was being retaliated against for raising quality/safety and discrimination concerns and was being discriminated against based on his age.  These claims were similarly dismissed.

filed his original Complaint under seal on February 1, 2008.  SAC at ¶ 126; Dkt 1.  The

Complaint remained under seal for 34 months while the DOJ conducted its investigation. Dkt. 1.

### B.    The Unsealing Of The Original Complaint, And McArtor's And Ramsey's New Amended Complaint

On December 3, 2010, the DOJ determined that it would not intervene in McArtor's case.

Dkt. 38.  The Court then unsealed the Complaint on December 6 and ordered McArtor to serve it

"upon the Defendant[.]"  Dkt. 39 at ¶ 1.  McArtor did not serve his original Complaint on Rolls-

Royce, however.  Instead, he filed an Amended Complaint on March 30, 2011, which included a

new Relator, Keith Ramsey, and a revised set of claims asserted on behalf of both McArtor and

Ramsey.  Dkt. 41.  The new Relator, also a former employee who left Rolls-Royce in 2006,

asserted that he had observed fraudulent behavior at the Company since 2003.  SAC at ¶¶ 17, 57,

128.  Yet Ramsey did not tell anyone in the Government about his allegations until March 28,

2011.  SAC at ¶ 128.  This purported disclosure to an (unnamed) DCMA official came two days

before he sought to join McArtor's lawsuit, but five years after he left Rolls-Royce, three years

after McArtor filed suit, and more than three months after the DOJ concluded its investigation

into the allegations of fraud.  *Compare id.* with Dkts 1 & 41.

On June 20, 2011, Rolls-Royce filed a motion to dismiss Count I of the Amended

Complaint as barred by the public disclosure doctrine, the first-to-file rule, and Rule 9(b).  Dkts.

58-59.  Among other things, Rolls-Royce noted that McArtor and Ramsey had improperly

commingled their claims, making it impossible to determine which Relator was the alleged

source of which allegation.  *Id.*  After Relators finally admitted that their Amended Complaint

had incorrectly asserted certain claims on behalf of Ramsey, Rolls-Royce also sought limited

jurisdictional discovery and the Court suspended further briefing.  Dkt. 71 at 1 (Order); Dkt. 72

(Rolls-Royce's Motion for Limited Discovery); Dkt. 73 (Relators' Opposition Brief).

On October 31, 2011, the Court ordered Relators to file a Second Amended Complaint that clearly distinguished which Relator—McArtor or Ramsey—was the source of each allegation.  Dkt. 74 at 8-9.  The Court also held that "Rolls-Royce can then assert by way of motion any Rule 12 arguments it then wishes to assert based on the newly-amended (and clarified) complaint."  *Id.* at 9.

### C.      The Second Amended Complaint

Relators' filed their Second Amended Complaint on November 14, 2011.  Dkt. 75. Despite having had the benefit of Rolls-Royce's prior motion to dismiss and supporting brief as a roadmap, the Second Amended Complaint remarkably added very little by way of detail, but instead referenced the same four generically-described categories of "false claims" that had been first introduced in the Amended Complaint.  Moreover, while the Second Amended Complaint does identify which Relator was the source for certain allegations, the purported source of many more allegations remain unidentified.  *See* SAC at ¶¶ 126-129.  Indeed, among the allegations not supported by either McArtor or Ramsey are ones most germane to their cries of fraud, including:

- That Rolls-Royce sought AS9100 certification "not" because of "a genuine commitment to AS9100 quality standards …. [but] purely for business reasons so that RRC could obtain new DoD contracts." *Id.* at ¶¶ 30-45 (quotation from *id.* at ¶ 45).

- That Rolls-Royce's defect rate did not meet the alleged "gold standard for manufacturing process, known as 'Six Sigma'"; that Rolls-Royce's scrap rate was high; and that Rolls-Royce should have conducted "hundreds" of First Article Inspection Reports. *Id.* at ¶¶ 47 & 49.

- That "RRC management was engaged in a concerted effort to undermine the entire quality process." *Id.* at ¶ 62.

- That Rolls-Royce had to be recertified under AS9100 in 2005 "in response to the 2004 T56 engine failures discussed above" (what "above" references is not identified). *Id.* at ¶ 86.

- That Rolls-Royce "did not disclose the numerous cost-cutting measures" during the 2005 recertification audit and "concealed RRC's actual quality control practices, which they knew did not comply with the QMS or the vast majority of AS9100 requirements." *Id.* at ¶ 87.

- Those that list Rolls-Royce's "most significant noncompliances" with "AS9100B." *Id.* at ¶ 88.

- That "Kleiner and other top managers [at Rolls-Royce] deliberately provided the [AS9100] auditor with only limited documentation, thereby concealing evidence RRC was required to disclose[.]" *Id.* at ¶ 89.

- Those that identify the specific contracts at issue and purport to describe their alleged contents. *Id.* at ¶¶ 131-134.

- That every sale to the Government requires the certificate of conformance set forth in Federal Acquisition Regulation ("FAR") 52.246-15(d) as "a condition precedent to shipping the product and demanding payment." *Id.* at ¶ 141.

*Compare id.* at ¶¶ 126-129.

Given the absence of support for these allegations, and Relators' continuing failure to plead their fraud claims with the requisite particularity, Rolls-Royce renews its motion to dismiss Count I.[5]

## III.   RAMSEY'S ALLEGATIONS SHOULD BE DISMISSED UNDER THE FIRST TO FILE RULE

As a threshold matter, the claims related to Ramsey can be immediately pruned from the case as the allegations in the Second Amended Complaint make clear that they are barred by the "first-to-file rule."  Under this rule, a relator like Ramsey is prohibited from intervening in a previously-filed FCA lawsuit. 31 U.S.C. § 3730(b)(5).

### A.   Legal Standards

"When a person brings an action under" the False Claims Act, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. 3730(b)(5).  Among the important purposes of the "first-to-file" rule are to encourage relators to come forward early and allow the DOJ to conduct its own investigation while the allegations remain under seal.  *U.S. ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 363-64 (7th Cir. 2010).  Consequently, Congress decided to bar "me-too suits" by prohibiting late arriving relators from intervening in, or bringing, "related" claims.  31 U.S.C. 3730(b)(5).

Two claims are "related" under the FCA if they cover the same material facts.  *Chovanec*, 606 F.3d at 363-65.  Importantly, the claims need not be identical.  *Id.*  Rather, the bar applies if

---

[5] Although there are additional jurisdictional and procedural grounds to challenge Relators' claims, including under public disclosure doctrine (some of which were raised in the original motion to dismiss, *see* Dkt. 74 at 8-13), Rolls-Royce will reserve those arguments for the future.

"a subsequent complaint raises the same or a related claim based in significant measure on the core facts or general conduct relied upon in the first *qui tam* action." *U.S. ex rel. Batty v. Amerigroup Ill., Inc.*, 528 F. Supp. 2d 861, 873 (N.D.Ill. 2007) (citation omitted). After all, once the original relator describes the general fraudulent conduct, the Government is armed with the necessary information needed to launch into its own comprehensive investigation and discover all related frauds. *See, e.g., U.S. ex rel. St. John LaCorte v. SmithKline Beecham Clinical Lab., Inc.*, 149 F.3d 227, 234 (3rd Cir. 1998). Indeed, the FCA gives broad powers to the Government to conduct a comprehensive investigation. *See, e.g.,* 31 U.S.C. §§ 3731(c) & 3733. Thus, a second relator who simply "alleges additional or somewhat different details about the defendant's fraud" does not further the main goal of the FCA – which is to encourage whistleblowers to *quickly* come forward so that the DOJ has the opportunity to investigate the alleged fraudulent scheme. *Batty*, 528 F. Supp. 2d at 873; *see also* 31 U.S.C. § 3731 & §3733; *Chovanec*, 606 F.3d at 363-65; *LaCorte*, 149 F.3d at 234.

Because of the importance of encouraging early whistle-blowing, courts have declared the first-to-file rule to be "exception free," and it applies to new lawsuits as well as attempts to intervene in an existing lawsuit. 31 U.S.C. 3730(b)(5); *see also U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 33 (1st Cir. 2009); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1183 (9th Cir. 2001); *U.S. ex rel. LaCorte v. Wagner*, 185 F.3d 188, 191-92 (4th Cir. 1999). Thus, it cannot be evaded by attempting to add a new relator by amendment, as McArtor and Ramsey seek to do here. *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 551 F. Supp. 2d 100, 110 (D. Mass. 2008) ("The first-to-file bar is 'exception-free,' and cannot be circumvented simply by amending the complaint to add McClellan as a relator when his claims would have been barred had they been brought on their own.") (citations omitted), *aff'd in part,*

*rev'd in part* on irrelevant grounds, 579 F.3d 13 (1st Cir. 2009); *accord U.S. ex rel. Nowak v. Medtronic, Inc.*, Nos. 1:08-cv-10368, 1:09-cv-1165, 2011 WL 3208007, *18-*19 & n.14 (D. Mass. July 27, 2011) (refusing to permit amendment to include new claims by new relator); *U.S. ex rel. Wilson v. Bristol Myers Squibb, Inc.*, 2011 WL 2462469, at *8 (D. Mass. June 16, 2011) (refusing to permit amendment to include new claims by unrelated, new relator on multiple grounds, including the first-to-file rule); *U.S. ex rel. Denenea v. Allstate Ins. Co.*, No. 07-2795, 2011 WL 231780, *3 (E.D. La. Jan. 24, 2011) (a "relator cannot avoid the first-to-file bar by consolidating his claim with an earlier action.... Otherwise, the FCA's goal of preventing duplicative litigation would be undermined.") (collecting cases); *U.S. ex rel. Manion v. St. Luke's Regional Med. Ctr., Ltd.*, No. 06-498-S-EJL, 2008 WL 906022, at *7 (D. Idaho Mar. 31, 2008) ("Adding Smyth to the complaint would constitute intervening when using the plain meaning of the term"); *U.S. v. Crescent City EMS, Inc.*, No. 91–4150, 1994 WL 518171, *7 (E.D. La. Sept. 21, 1994) (refusing to permit amendment to add second relator).[6]

### B.    Ramsey's Claims Are Barred Under The First-To-File Rule

Ramsey is clearly attempting to bring a related claim under the FCA.  It is based in significant measure on the general conduct alleged in Lusby's original Complaint.  *Compare* SAC *with* Dkt. 1 (both asserting that Rolls-Royce's purported promise to follow AS9100 standards was fraudulent because Rolls-Royce subsequently failed to follow quality procedures and claiming that the alleged failure to follow quality protocols rendered false unidentified

---

[6] The Tenth Circuit takes a contrary position and interprets the FCA's use of the word "intervene" to relate solely to adding a relator via a motion under Fed. R. Civ. P. 24.  *U.S. ex rel. Precision Co. v. Koch Indus., Inc.*, 31 F.3d 1015, 1017-18 (10th Cir. 1994).  That position has not been adopted by the other circuits.  *See, e.g.*, *Duxbury*, 579 F.3d at 33; *Lujan*, 243 F.3d at 1183 (first-to-file rule exception free); *LaCorte*, 185 F.3d 188 (same); *Fed. Recovery Servs., Inc. v. U.S.*, 72 F.3d 447, 453 (5th Cir. 1995) (same, and rejecting the Tenth Circuit's reasoning where a relator sought to amend a complaint to substitute relators).  Indeed, the Tenth Circuit's narrow interpretation of "intervene" is contrary to the balance struck by the first-filed rule:  "encouraging private citizens to act as whistleblowers while at the same time preventing opportunistic suits." *Batty*, 528 F. Supp. 2d at 872.

certificates of conformance).  That Ramsey may seek to expand upon those allegations by discussing different quality processes is irrelevant; Ramsey borrows the same core of material facts from McArtor for his claims.  *Chovanec*, 606 F.3d at 363; *LaCorte*, 149 F.3d at 234; *Batty*, 528 F. Supp. 2d at 873.  That core was first raised by McArtor in 2006, investigated by the DOJ over a 34-month period beginning in 2008 and included in a FCA Complaint filed by McArtor in 2008.  Ramsey asserts he began observing wrongdoing in 2003 and was fired for raising quality concerns in March 2006, yet he admittedly refrained from disclosing the purported fraud to anyone in the Government until March 28, 2011.  *See* SAC at ¶¶ 17, 57, 128.  This inexplicable delay is the very antithesis of the conduct Congress sought to encourage when it enacted the FCA.

Accordingly, the Court should apply the Seventh Circuit's holding in *Chovanec* and dismiss Ramsey and his allegations from this lawsuit under the first-to-file rule, including all of his alleged contributions to paragraphs 57-61 and 94-110 of the Second Amended Complaint. *Chovanec*, 606 F.3d at 365.  Leave should then be granted to Ramsey to re-file his claims only after McArtor's lawsuit is concluded and ***only if*** Ramsey is able to overcome the substantial pleading, procedural and jurisdictional hurdles to those allegations.  *Id.* [7]

## IV.     COUNT I OF THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Apart from the fact that Ramsey's claims are doomed under the first-to-file rule, ***all*** claims in Count I should be dismissed under Rule 12(b)(6) for failure to plead with particularity.

---

[7] Ramsey's claims are also subject to jurisdictional and other challenges that make his joinder impractical, such as the public disclosure doctrine discussed at Dkt. 59 at 6-13.  Ramsey's improper inclusion in the current lawsuit would also raise significant statute of limitations concerns given the varying dates on which McArtor (2008) and Ramsey (2011) raised their claims.

### A.   Legal Standards

The Second Amended Complaint is subject to the pleading requirements of Rule 8 and, because it involves a charge of fraud, the heightened standards of Rule 9(b).  *U.S. ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).  Rule 8 requires that a complaint state "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility only when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (*citing Twombly*, 550 U.S. at 556).  Moreover, when assessing which side of the line an FCA allegation falls, it must be remembered that a relator is required to establish that the underlying claim for payment is "objectively false."  *U.S. ex. rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 2011 WL 3084932 at * 14 (7th Cir. 2011) (citations omitted).  Consequently, a plausible claim of fraud can not be based merely on a failure to follow policies, a disregard of regulations, a breach of contract, an act of negligence, or fraudulent or "wrongful" conduct against third parties.  *Gross*, 415 F.3d at 604.  Nor may a claim be based on a difference of opinion or a dispute over how a standard should be interpreted.  *Yannacopoulos*, 2011 WL 3084932 at * 14.

Pleading a plausible FCA fraud claim also requires that the *factual content* supporting the allegations be pled with particularity.  Fed.R.Civ.P. 9(b).  Indeed, that content must describe in detail the "who, what, when, where, and how" of the circumstances giving rise to the alleged false claims.  *Gross*, 415 F.3d at 604; *Garst*, 328 F.3d at 376.  It must also detail the actual false claims submitted to the Government.  While a *qui tam* complaint need not call out every

allegedly false invoice or provide all the details of payment, it must at least identify an objectively false statement and specific sales to and payments by the Government in order to satisfy Rule 9(b)'s requirements at the pleadings stage. *Gross*, 415 F.3d at 604; *Garst*, 328 F.3d at 378; *U.S. ex rel. Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 564 (6th Cir. 2003) (a "failure to identify specific parties, contracts, or fraudulent acts requires dismissal."); *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *accord U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854-55 (7th Cir. 2009) (accepting first claim where the "complaint names specific parts shipped on specific dates, and it relates details of payment" but rejecting second where the Relator neither knew nor alleged "what the military and Rolls-Royce said to each other"). A relator is also required to "link specific allegations of fraud to claims for government payment." *Mason v. Medline Indus., Inc.*, No. 07 C 5615, 2009 WL 1438096, *2 (N.D. Ill. May 22, 2009) (citing *Garst*, 328 F.3d at 378). And, critical to the point underlying this very motion, ***these details must be provided at the outset of the case***: A relator cannot file suit and hope to "learn the complaint's bare essentials through discovery." *Clausen*, 290 F.3d at 1310, n.17.

These requirements do not exist merely to force a relator to provide clear notice of his allegations; they also exist "to protect [defendants] from privileged libel (privileged because it is contained in a pleading)." *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740 (7th Cir. 2007), *overruled in irrelevant part by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009). "[F]raud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it … and … frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir.1999) (citations omitted). Such irresponsible conduct is often

found in FCA cases, both because of the bounty offered to successful relators and because relators (like McArtor and Ramsey here) are frequently former employees who have an axe to grind against their ex-employer. *Clausen*, 290 F.3d at 1313 n.24 (recognizing that relators who do not specifically plead the minimum elements of their allegations "needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements.").

**B.      Relators Fail To Provide The Necessary Particulars Regarding Their Fraudulent Inducement Claims (Alleged False Claims "A" And "D")**

Relators advance two fraudulent inducement claims, each premised on Rolls-Royce's alleged decision to "tout" its compliance with the AS9100 quality standard to the Government. *See* Dkt. 75 at ¶¶ 34-45, 88, 131-135, 143-147; Claims "A" and "D." "Although a breached contractual term may be considered a falsehood in a looser sense – a false promise – a mere breach of a contractual duty does not satisfy" the False Claims Act. *Yannacopoulos*, 2011 WL 3084932 at * 14. Rather, to make these claims plausible, McArtor and Ramsey are required to provide the details of the relevant contract negotiations, identify the "time, place, and contents" of the objectively false statement(s) that induced the Government to enter into the contracts, and identify the persons making the alleged misrepresentations. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). Relators must also allege facts demonstrating "prompt, substantial nonperformance" of the relevant, bargained-for term. *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) (citations omitted); *see also Willard*, 336 F.3d at 385. Because Relators do not plead their inducement claims with particularity, they must be dismissed.

      1.     **The Second Amended Complaint Does Not Identify the Who, When or How Rolls-Royce Fraudulently Induced The Government To Enter Into "Approximately 180 Contracts" (Asserted by McArtor and Ramsey, Alleged False Claim "A")**

Relators' first fraudulent inducement claim is that Rolls-Royce conspired sometime between 2000 and 2002 to "tout" its AS9100 certification in order to induce the Government to enter into "approximately 180" contracts, while at the same time secretly deciding that it would ignore that standard. SAC at ¶¶ 30-35, 45, 131-135 (Claim "A").   To be plausible, such speculation must be supported by specific allegations regarding *how* Rolls-Royce's alleged lies actually induced the Government into entering these contracts.  Necessary details would include *who* was involved in the negotiations, *where* and *when* the negotiations took place, *what* was said before, during, or after the contract negotiations and the *specifics* of the contracts which were fraudulently induced, as well as evidence of prompt, substantial nonperformance.  *Willard*, 336 F.3d at 385 (affirming dismissal of fraud-in-the-inducement claim where Relator "does not allege who was involved in the [contract] negotiations, or where or when the negotiations took place" or "any facts alleged as to what was said before, during, or after the contract negotiations"); *U.S. ex rel. Snapp, Inc. v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 63850, at *17-*18 ( E.D. Mich. Sept. 7, 2006) (dismissing complaint due, in part, to the fact that it did not identify which specific contracts were fraudulently induced), *aff'd*, 532 F.3d 496, 506 (6th Cir. Mich. 2008); *accord Lusby*, 570 F.3d at 854-55 (dismissing claim that settlement agreement was fraudulently induced where the Relator did not allege "what the military and Rolls-Royce said to each other"). Relators provide none of the required details.

First, Relators fail to plead any facts concerning any "inducement," fraudulent or otherwise.  Neither Relator claims he was involved in any negotiations where the Government was induced to enter into the contracts or attests he has knowledge of what was said to the

-15-

Government in those negotiations. *See* SAC (all allegations). Thus, it is no surprise that the Second Amended Complaint fails to identify critical details such as *when* and *where* the negotiations regarding these contracts took place, and *what* was said in those meetings. Such details regarding the alleged ***inducement*** are required for a fraudulent inducement claim. *Willard*, 336 F.3d at 385; *Snapp*, 2006 U.S. Dist. LEXIS 63850, at *17-*18.

Relators next fail to identify any contracts that were fraudulently induced, let alone demonstrate that they were induced due to the existence of the AS9100 standard. Relators cite three "example[]" contracts and assert that "[a]vailable data demonstrates that from 2003 to 2006 … RRC sought and obtained approximately 180 DoD contracts, or modifications or extensions thereof." SAC at ¶ 131-134. Neither Relator identifies himself as knowledgeable about the content of any of these contracts, however. *See* SAC at ¶¶ 126-129. Moreover, Relators provide no support for their conclusion that each of these contracts required Rolls-Royce to follow the AS9100 quality standard. None of the "example" contracts cited in the Complaint reference the AS9100 standard.[8]  *See* Ex. 1 at 25[9] (contract excerpt) (incorporating ANSI/ASQC ISO 9001 or comparable system, not AS9100); Ex. 2 at Clause F-4 (contract excerpt) (incorporating ISO 9001:1994, not AS9100); Ex. 3 at Sec. E on p. 8 (contract excerpt) (incorporating ISO 9001:2000, not AS9100). No facts are alleged demonstrating that any other relevant contract includes the AS9100 standard. *See* SAC at ¶ 131-134. Indeed, the Second Amended Complaint ***never once*** quotes AS9100 standard or any other quality standard. SAC at ¶¶ 30-45. All of its

---

[8] In evaluating whether Rule 9(b)'s requirements have been met, "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). Indeed, where there is conflict between the assertions in the complaint and the documents, the exhibits trump the allegations. *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co. of Chicago*, 927 F.2d 988, 991 (7th Cir. 1991).

[9] The Second Amended Complaint erroneously states that the relevant clause is on page 21; it is in fact on page 25. *Compare* SAC at ¶ 132 *with* Ex. 1.

allegations regarding the AS9100 standard are alleged paraphrases or interpretations. *Id.*[10] Worse, when confronted in the last round of briefing with the fact that none of the "example[]" contracts mentioned the AS9100 standard, Relators could only complain that Rolls-Royce "should not be using [Relators'] lack of familiarity [with the contracts] to gain an unfair advantage in the briefs." Dkt. 68 at 20. But if Relators are so unfamiliar with the terms of the relevant contracts, they have no grounds to charge that the contracts were breached—much less fraudulently induced.

Even if Relators overcame these considerable hurdles, the Complaint would still flunk Rule 9(b) as it lacks sufficient details about any purported false claim or alleged fraudulent scheme. The Second Amended Complaint fails to identify a single claim for payment in any way (*e.g.*, by date, product, approximate amount, contracting agency) or link any claim for payment to a false statement. This information is mandatory. *Gross*, 425 F.3d at 604. Relators also do not identify *who* at Rolls-Royce decided, sometime between 2000 and 2002, to fraudulently induce "approximately 180" contracts by touting the AS9100 standard, SAC at ¶¶ 30-45, or *who* at "RRC's parent company . . . brought in new managers . . . who would apply a manufacturing focus and subordinate the Quality Assurance department to the Operations department." SAC at ¶ 34. Also remarkable is the lack of any factual content regarding how the alleged scheme was implemented. Was there an agreement? An interoffice memo? A teleconference? A text message? Relators plead no facts, and their conclusory guesswork simply is insufficient to support a fraud claim. *Gross*, 415 F.3d at 604; *Garst*, 328 F.3d at 376; *accord Wilson*, 525 F.3d at 379; *Willard*, 336 F.3d at 385.

---

[10] Whose paraphrases and interpretations of AS9100 is unknown, because neither Relator will identify himself as the source of these allegations. *See* SAC at ¶¶ 126-129.

Finally, Relators fail to allege prompt nonperformance of any contractual term—a necessary and independent pleading requirement for a fraudulent inducement claim under the FCA.  *See Wilson*, 525 F.3d at 379 (pleading must allege with particularity facts demonstrating prompt, substantial noncompliance to support fraudulent inducement claim).  Indeed, Relators' theory is that the ***cumulative*** impact of Rolls-Royce's alleged cost cutting measures resulted in a quality system that did not comply with AS9100, and they primarily rely on allegations from 2004, 2005 or 2006. *See, e.g.*, SAC at ¶¶ 20-21 (key personnel in implementing the alleged plan of "RRC management" were not in place until 2004 and 2005); ¶ 36; ¶ 46 (discussion that purportedly occurred in May, 2006); ¶ 52 (Rolls-Royce purportedly abandoned "source and method change requirements" in "2005"); ¶ 53 ("Project Evolution" allegedly occurred in 2005); ¶¶ 58(a)-(c) & 59 (quality personnel were purportedly stripped of resources and independence in 2005 and 2006); and ¶ 69 ("records-only MRB" purportedly adopted in 2004).  These subsequent alleged events provide ***no*** support for Relators' claim that Rolls-Royce decided ***in 2002*** (or before) that it would not perform under future contracts.  *Wilson*, 525 F.3d at 379; *Willard*, 336 F.3d at 385.

> **2.  The Amended Complaint Does Not Identify How Rolls-Royce Fraudulently Induced The Government To Enter Into Contracts Associated With A 2005 Audit (asserted by McArtor alone, Alleged False Claim "D")**

The second fraudulent inducement claim (Alleged False Claim "D") is asserted by McArtor alone, and alleges Rolls-Royce deceived an AS9100 auditor into recertifying that its systems satisfied the AS9100 standard in late 2005.  *See* SAC at ¶¶ 143-147.  To the extent that McArtor is alleging a deception of an AS9100 auditor, however, these allegations are insufficient:  The FCA only redresses false claims for payment made to the Government, not other alleged frauds or wrongdoing. *Gross*, 415 F.3d at 604.  Thus, to state a claim under the

FCA, McArtor must tie his allegations to an actual contract which was entered into as a result of the purported deception and an actual false claim for payment submitted pursuant to that fraudulently-induced Government contract.  *Id.*

McArtor establishes no such ties.  He does not identify a single contract that was executed based on this 2005 recertification audit.   Indeed, the three "example" contracts identified in the Second Amended Complaint were all executed ***prior*** to the 2005 AS9100 recertification, and, in any event, ***none*** included the AS9100 standard.  Exs. 1-3.  McArtor also fails to supply any details concerning how the Government was fraudulently induced.  He does not allege that he participated in ***any*** relevant negotiation with the Government and does not identify ***any*** statement by Rolls-Royce to the Government regarding AS9100 standard or the 2005 recertification.  These details are essential elements of his fraudulent inducement claim at the pleadings stage:   McArtor must be able to enunciate what Rolls-Royce said to the Government and what the Government said to it during the negotiation of the affected contracts.  *See, e.g., Wilson*, 525 F.3d at 379; *Willard*, 336 F.3d at 385.  McArtor further fails to identify a single claim for payment under these unidentified contracts.  *See Gross*, 425 F.3d at 604.  All these omissions – whether by themselves or taken together – are fatal under Rule 9(b).

## C. Relators Fail To Identify Any Reverse False Claims (asserted by McArtor alone, Alleged False Claim "B")

The next group of allegations made by McArtor concern Rolls-Royce's purported "Fraudulent Concealment of Quality Escapes." SAC at ¶¶ 136-140 (Section "B").  McArtor argues that Rolls-Royce committed a so-called "reverse false claim" by failing to disclose certain quality escapes and thereby improperly avoiding an obligation to pay the Government for such escapes.  *Id.* at ¶ 131.  These assertions, which are apparently based on the wrong version of the False Claims Act, fail to state a claim for legal relief for two reasons:  First, McArtor fails to

plead the existence of the required "false record or statement"; second, McArtor fails to plead a concrete and definite "obligation" that Rolls-Royce's allegedly avoided.  *See* 31 U.S.C. 3729(a)(7) (1994).

McArtor's failure to plead the essential elements of a "reverse false claim" arises in part from his citation to Section 3729(a)(1)(G) as the statutory authority for his reverse false claims theory. SAC at ¶ 140. Yet two "timeline" issues become immediately relevant.  First, Section 3729(a)(1)(G) was not added to the FCA until 2009; second, McArtor alleges that the events that purportedly give rise to this claim occurred in or around 2005 and 2006.  Consequently, the applicable "reverse false claims" provision is not Section 3729(a)(1)(G) but the ***prior*** version of the Act, 31 U.S.C. 3729(a)(7) (1994).  *See Lusby*, 570 F.3d at 855 fn.* ("We use the versions [of the "reverse false claims" provision] that were in force when the events at issue in this suit occurred.") (*citing Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483 (1994)).[11]

The difference between the two versions of the statute is important to this case.  Prior to 2009, a reverse false claim required the use of "***a false record or statement*** to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  31 U.S.C. 3729(a)(7) (1994) (emphasis added); *see also, e.g., U.S. ex rel. Wood. v. Applied Research Assocs., Inc.*, 328 Fed. Appx. 744, 748 (2d Cir. 2009); *Wilkins ex rel. U.S. v. Ohio*, 885 F.Supp. 1055, 1064-65 (S.D.Ohio 1995).  That is, a defendant must affirmatively submit a record or statement to the Government to be liable for a "reverse false claim" under the statute applicable to McArtor's claims.  *Id.*  McArtor pleads no such false record or statute.  Instead, he relies exclusively upon the purported *absence of a record,* a *failure to speak* or alleged misstatements

---

[11] Rolls-Royce pointed out to McArtor that he was pursuing claims under the wrong version of the FCA during the prior round of briefing.  *See* Dkt. 59 at 26-27.  Despite admitting his error, and calling it a "non-substantive slip up on counsel's part" (Dkt. 68 at 31 n.15), McArtor continues to rely on the wrong version of the statute in the Second Amended Complaint (SAC at ¶ 140).

made to *Rolls-Royce personnel*—not to the Government.  SAC at ¶¶ 136-140.  None of these allegations is sufficient to state a claim under the applicable version of the FCA, 31 U.S.C. 3729(a)(7) (1994).

The first "reverse false claim" McArtor points to is the alleged recording of certain quality escapes in "records only MRB" documents rather than in "Customer Facing Business Unit" documents.  SAC at ¶¶ 136-137.  McArtor argues that, by purportedly engaging in this practice, Rolls-Royce rendered its Customer Facing Business Unit documents false by omission.  *Id.*; *see also* Dkt. 68 at 32.  Similar "fraud-by-omission" theories espoused by other relators have been rejected.  For example, in a case Relators cited as persuasive in an earlier briefing, Dkt. 68 at 32, the court in *Wilkins* expressly rejected a "reverse false claim" based on the theory that the defendants "failed to record" certain information.  885 F.Supp. at 1064.  Instead, *Wilkins* held that the omission of information from a record can only support a "reverse false claim" where the information was required to be in the record *and* the record was "required to be maintained."  *Id.*

There is no allegation in the Second Amended Complaint that information regarding quality escapes was required to be contained within "Customer Facing Business Unit" documents.  Rather, McArtor merely speculates that the Government "would expect to find such records there" if the Government decided to look at them.  There is also no allegation that Rolls-Royce was ***required*** to maintain Customer Facing Business Unit records.  Therefore, McArtor's failure to plead that Customer Facing Business Unit records were required to contain quality escape information and that such records were required to be maintained for the Government is fatal to his "reverse false claim" allegations.  *Wilkins*, 885 F.Supp. at 1064-65.

McArtor next alleges that his exclusion from the "PPR process" and Mr. Kleiner's alleged "affirmative misrepresentations" to him in 2006 constitute reverse false claims.  SAC at

¶ 138.  This assertion is also baseless.  McArtor was a Rolls-Royce employee and an employee-designee for the FAA; he does not allege that he had any responsibility for defense matters, maintained any relationship with the Department of Defense, or had any involvement in armed forces procurement.  *See* SAC.  Thus, it is implausible to believe, and McArtor does not even allege, that any statement to him, true or false, could "conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  He has therefore not pled a valid reverse false claims action under the FCA.  31 U.S.C. 3729(a)(7) (1994).

McArtor's assertion that Rolls-Royce "concealed quality escape information by failing to disclose it during regular meetings between DoD/DCMA and Defense North America" is also implausible.  SAC at ¶ 139; *see also* Dkt. 68 at 32.  McArtor does not allege that he was at ***any*** of the relevant review meetings.  SAC at ¶ 139.  Consequently, McArtor's claim that the Rolls-Royce personnel who did participate in these meetings failed to disclose relevant information is pure speculation and devoid of the particulars required by Rule 9(b).  *Id.* Among other things, McArtor does not identify the dates of the relevant meetings or what alleged quality escapes should have been disclosed but were not.  And McArtor still has not identified a false ***"record"*** or ***"statement"*** that was affirmatively provided to the Government—the *sine qua non* of a reverse false claims allegation.  31 U.S.C. 3729(a)(7) (1994) (emphasis added); *Wood*, 328 Fed. Appx. at 748; *Wilkins*, 885 F.Supp. at 1064-65.

Finally, in addition to failing to identify a false "record" or "statement," McArtor also fails to identify any "obligation" that is actionable under his "reverse false claims" theory.  31 U.S.C. 3729(a)(7) (1994).  In order to constitute an "obligation" under the applicable version of the False Claims Act, a defendant must have a pre-existing legal duty to pay a fixed sum to the Government. *See, e.g., United States v. Q International Courier, Inc.*, 131 F.3d 770, 773 (8th

Cir. 1997).  "[T]he reverse false claims act does **not** extend to the potential or contingent obligations to pay the government fines or penalties which have not yet been levied or assessed[.]" *United States ex rel. Bain v. Georgia Gulf Corp.,* 386 F.3d 648, 657 (5th Cir. 2004) (emphasis added). McArtor fails to identify any obligation by Rolls-Royce to pay a fixed sum in connection with any quality escape; he at most alleges that the Government **may choose** to require a concession or repayment in some circumstances.  *See, e.g.,* SAC at ¶ 65.  An allegation that the Government may require payment from Rolls-Royce in the future, however, is exactly the kind of contingent liability that cannot support a reverse false claim as a matter of law.  *See, e.g., Bain,* 386 F.3d at 657; *American Textile Manufacturers Inst., Inc. v. The Limited, Inc.,* 190 F.3d 729, 738 (6th Cir.1999), *cert. denied,* 529 U.S. 1054, 120 S.Ct. 1556, 146 L.Ed.2d 461 (2000) ("Contingent obligations – those that will arise only after the exercise of discretion by government actors – are not contemplated by the statute.").  For this reason as well, McArtor's "reverse false claims" theory must be dismissed.

> **D.**   **Relators False Certification Claim Is Further Doomed As Their Allegations Are Contradicted By Their Incorporated Exhibits And They Fail To Identify Any Sales Conditioned On Such Certifications (Alleged False Claim "C")**

Relators' final fraud claim is based upon their theory that Rolls-Royce was required to provide a particular Certificate of Conformance to the Government in order to get paid for the parts and engines it sold. *See* SAC at ¶¶ 141-42 (citing 48 C.F.R. 52.246-15(d), *i.e.,* Federal Acquisition Regulation ["FAR"] 52.246-15(d)).  Relators allege that these certificates were false. *Id.*  To make out this type of "false certification" claim, however, a relator must establish not only that the defendant actually presented a false certificate to the Government, but also "that the certification of compliance [was] a condition of or prerequisite to government payment."  *U.S. ex rel. Crews & Ill. v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 858 (7th Cir. 2006) (citing *Gross,* 415 F.3d at 604).

Relators have not stated a cognizable false certification theory.  While Relators' Second Amended Complaint asserts that a Certificate of Conformance was always "provided to the United States for each aircraft engine and part that [Rolls-Royce] sold," SAC at ¶ 141, this allegation is both unsupported and wrong.  The applicable regulations make certificates of conformance **optional**, not mandatory:  they are contract dependent and may be incorporated, or not, based on the parties' negotiations.  *See* 48 C.F.R. 46.504; *see also* 48 C.F.R. 52.246-15(a) & (d)) (Ex. 4).[12]  Consequently, Relator's blanket allegation that every contract mandated that every shipment sold under that contract be accompanied by a certificate of conformance is fiction – especially since neither Relator admits to being the source of this speculation.  *See, e.g.,* SAC at ¶¶ 126-129.  Relators' allegations are made even more implausible by their inability to identify even a single contract that requires Rolls-Royce to provide the recited Certificate of Conformance as a condition precedent to payment.  SAC at ¶ 141.  Indeed, the two Rolls-Royce contracts that Relators do cite to in their Second Amended Complaint did not incorporate FAR 52.246-15(d) (Exs. 1, 2) and Relators do not even bother to allege that the third "example" contract (to which Rolls-Royce is not a signatory) incorporates FAR 52.246-15(d) (Ex. 3).  Thus, Relators' false certification theory rests upon a fundamentally false assumption and must be dismissed.

Given this false assumption, it is not surprising that Relators are unable to identify any document provided to the Government that both purportedly contained the recited certification and was required to be provided in order to receive payment.  A false certification claim must plead facts showing that the alleged false certification was a condition to payment by the Government.  *Gross*, 415 F.3d at 605.  The Second Amended Complaint is devoid of any such

---

[12] Indeed, in Relators' prior opposition to Rolls-Royce's motion to dismiss their (first) Amended Complaint, Relators admitted that the Government does not always require a Certificate of Conformance.  Dkt. 68 at 27.

allegations: Relators fail to plead when "specific [nonconforming] parts shipped on specific dates, and . . . details of payment," or to link alleged "false" certifications to such sales – details which are required to demonstrate that the certification was a condition to payment.  *Compare* SAC at ¶ 141-142 *with Lusby*, 570 F.3d at 854 *and Gross*, 415 F.3d at 605; *see also Yuhasz*, 341 F.3d at 564-65 (6th Cir. Ohio 2003) (dismissing false certification claim where relator failed to identify a specific false claim submitted to the Government); *Mason*, 2009 WL 1438096, *2 ("In the context of alleged False Claims Act violations, plaintiffs must link specific allegations of fraud to claims for government payment.") (citing *Garst*, 328 F.3d at 378).  On these grounds as well, the Court should dismiss Relators' false certification claims.

*     *     *     *     *

In sum, Rule 9(b) does not allow a relator to assert, in conclusory fashion, that a defendant defrauded the Government.  It also does not permit a relator to assume that government contracts required certain quality standards or mandated the use of certain certificates.  Nor may a relator speculate that the Government made payments as a result of an unidentified false claim or statement.  Instead, a relator must provide at the pleading stage substantive facts in sufficient detail to establish the "who, what, when, where and how" of the alleged fraudulent schemes, and show that there is a plausible basis for their assertions that the defendant was required to do certain things under the contracts; and link any fraud to actual claims for payments.  The Relators in this case have not, and cannot, meet this threshold. Accordingly, their claims must be dismissed.

## V.      CONCLUSION

Although Ramsey and paragraphs 57-61 and 94-110 of Count I of the Second Amended Complaint warrant dismissal pursuant to the first-to-file rule, the entirety of Count I should be dismissed in any event based on Relators' failure to comply with Rule 9(b).

December 9, 2011                              Respectfully submitted,

                                             /s/ Jeff M. Barron
                                             Peter A. Morse, Jr. (IN 17474-49)
                                             Richard P. Winegardner (IN 17125-49)
                                             Jeff M. Barron (IN 27730-49; IL 6269374)
                                             Koryn M. McHone (IN 25008-49)
                                             Apryl E. Underwood (IN 29528-49; WI 1067019)
                                             BARNES & THORNBURG LLP
                                             11 South Meridian Street
                                             Indianapolis, Indiana 46204
                                             Telephone:  (317) 231-1313
                                             Facsimile:   (317) 231-7433
                                             pmorse@btlaw.com
                                             rwinegardner@btlaw.com
                                             jbarron@btlaw.com
                                             kmchone@btlaw.com
                                             aunderwood@btlaw.com

                                             ATTORNEYS FOR ROLLS-ROYCE CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2011, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to the following counsel; parties may access this filing through the Court's system.

Richard A. Waples
WAPLES & HANGER
410 North Audubon Road
Indianapolis, IN  46219
richwaples@aol.com

Michael Kanovitz
Anand Swaminathan
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL  60607

COUNSEL TO RELATORS

Jill Z. Julian
William Lance McCloskey
UNITED STATES ATTORNEY'S OFFICE
10 West Market Street, Suite 2100
Indianapolis, IN 46204
jill.julian@usdoj.gov
william.mccoskey@usdoj.gov

COUNSEL TO THE UNITED STATES OF
AMERICA

*/s/ Jeff M. Barron*