IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* THOMAS McARTOR and<br>KEITH RAMSEY,<br><br>       Relators/Plaintiffs,<br><br>v.<br><br>ROLLS-ROYCE CORPORATION,<br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:08 Civ. 0133 (WTL) (DML) |

**PLAINTIFFS' RESPONSE BRIEF TO
DEFENDANT'S SECOND MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

FACTS ..............................................................................................................4

    A.    Background on McArtor and Ramsey ................................................4

    B.    The Original and Amended Complaints ...........................................5

    C.    The Second Amended Complaint ....................................................5

    D.    The Employment Dispute Between RRC and McArtor ...................7

    E.    RRC's Similar Treatment of Ramsey ..............................................9

ARGUMENT .....................................................................................................9

    I.    The First to File Bar Does Not Apply Here .....................................9

    II.    Relators satisfy Rule 9(b) by pleading the circumstances of dozens of instances when RRC violated its Quality Management System and tying these violations to contractual requirements for payment ..............................12

        A.    Applicable Standard .................................................................12

        B.    Relators Allege the Specifics of the Underlying Quality Control Violations ....................................................................13

        C.    Relators Also Ground the Quality Requirements In RRC's Contracts ................................................................................16

        D.    The False Statements ...............................................................19

            1.    Fraudulent inducement of post-2002 contracts (Claim A).......19

            2.    False Certifications (Claim C) ....................................23

            3.    Reverse false claims (Claim B).................................29

            4.    False claims stemming from RRC's false statements during the re-certification (Claim D).....................................33

CONCLUSION .................................................................................................35

TABLE OF AUTHORITIES

Ab-Tech Constr., Inc. v. U.S., 31 Fed. Cl. 429 (Fed. Cl. 1994)....................................................27

American Textile Manufacturers Inst., Inc.v.The Limited, Inc.,
      190 F.3d 729 (6th Cir. 1999) ....................................................................................32

Bower v. Jones, 978 F.2d 1004 (7th Cir. 1992)....................................................................19

Daff v. U.S., 78 F.3d 1566 (Fed. Cir. 1996) ................................................................24

DiLeo v. Ernst & Young, 901 F.2d 624 (7th Cir. 1990)....................................................33

Fed. Recovery Servs., Inc. v. U.S., 72 F.3d 447 (5th Cir. 1995) ....................................10

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999)............................34

Imperial Meat Co. v. U.S., 316 F.2d 435 (10th Cir. 1963)............................................................27

Kennard v. Comstock Resources, Inc., 363 F.3d 1039 (10th Cir. 2004)......................................11

Lachmund v. ADM Investor Servs., Inc., 191 F. 3d 777 (7th Cir. 1999)....................................23

Laugelle v. Bell Helicopter Textron, Inc., et al., D.Del., No. 1:10 Civ. 1080............................4

Mason v. Medline Indus. Inc., 731 F. Supp. 2d 730 (N.D. Ill. 2010)..................................4, 14

Perlman v. Zell, 185 F.3d 850 (7th Cir. 1999)..............................................................19

PHI, Inc. v. Rolls-Royce Corp., W.D.La., No. 6:08 Civ. 1406................................................3

Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000) ........................................27

Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329 (7th Cir. 1995)........................................31

U.S. ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189 (10th Cir. 2006) ............................................

U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493 (6th Cir. 2007) ............................22

U.S. *ex rel.* Chovanec v. Apria Healthcare Group Inc., 606 F.3d 361 (7th Cir. 2010).................10

U.S. *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296 (6th Cir. 1998).......................24

U.S. *ex rel.* Crews & Ill. v. NCS Healthcare of Ill., Inc., 460 F.3d 853 (7th Cir. 2006)..........................26

U.S. *ex rel.* Hendow v. Univ. of Phoenix, 461 F.3d 1166 (9th Cir. 2006) ........................27, 34, 35

U.S. *ex rel.* Fallon v. Accudyne Corp., 97 F.3d 937 (7th Cir. 1996)................................11, 24, 27

U.S. *ex rel.* Howard v. Lockheed Martin Corp., 1:99-cv-285, 2011 WL 4348104
(S.D.Oh. Sept. 16, 2011)........................................................................................ 10

U.S. *ex rel.* Kennedy v. Aventis Pharm., 512 F. Supp. 2d 1158 (N.D. Ill. 2007)..........................11

U.S. *ex rel.* King v. DSE, Inc., 8:08-cv-2416, 2011 WL 1884012
(M.D. Fla. May 17, 2011) .....................................................................................24, 28, 34

U.S. *ex rel.* LaCorte v. Wagner, 185 F.3d 188 (4th Cir. 1999)....................................................10

U.S. *ex rel.* Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163 (10th Cir. 2010) .....................26

U.S. *ex rel.* Leveski v. ITT Educ. Serv., Inc., 1:07-cv-867-WTL-JMS, 2010 WL 1936118
(S.D. Ind. May 12, 2010) ........................................................................................12

U.S. *ex rel.* Lockhart v. General Dynamics, 529 F. Supp. 2d 1335 (N.D. Fla. 2007) ........24,28, 34

U.S. *ex rel.* Lujan v. Hughes Aircraft Co., 243 F. 3d 1181 (9th Cir. 2001) .................................10

U.S. *ex rel.* Lusby v. Rolls-Royce Corp., 570 F.3d 849 (7th Cir. 2009) .............................. *passim*

U.S. *ex rel.* Main v. Oakland City Univ., 426 F.3d 914 (7th Cir. 2009) ...............................19, 35

U.S. *ex rel.* Marcus v. Hess, 317 U.S. 537 (1943).................................................................34, 35

U.S. *ex rel.* Mccoy v. Madison Center, 2011 WL 1791710 (N.D. Ind. May 9, 2011) .................11

U.S. v. Ortho-McNeil Pharm., Inc., 03 C 8239, 2007 WL 2091185
(N.D.Ill. July 20, 2007)........................................................................................22

U.S. v. Pemco Aeroplex, Inc., 195 F.3d 1234 (11th Cir.1999) .............................................32, 33

U.S. *ex rel.* Precision Co. v. Koch Indus., Inc., 31 F.3d 1015 (10th Cir. 1994) .............................9

United States *ex rel.* Robinson v. Northrop Grumman Corp., 89-c-6111 (N. D. Ill) ......................3

U.S. v. Rogan, 517 F.3d 449 (7th Cir. 2008) ................................................................................31

U.S. *ex rel.* Sanders v. East Alabama Healthcare Authority, 953 F. Supp. 1404
(M.D.Ala. 1996)..................................................................................................................10, 12

U.S. v. Science Applications Int'l Corp., 626 F.3d 1257 (D.C. Cir. 2010) ...................................26

United States *ex rel.* Tyson v. Amerigroup, 488 F. Supp. 2d 719 (N.D. Ill 2007) ...................3, 20

U.S. *ex rel.* Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370 (4th Cir. 2008) .....................21

Varljen v. Cleveland Gear Co., Inc., 250 F. 3d 426 (6th Cir. 2001)..............................................27

West v. Rolls-Royce Corp., *et al.*, D.N.H., No. 10 Civ. 214...................................................................2

Wilkins *ex rel.* U.S. v. State of Ohio, 885 F. Supp. 1055 (S.D. Ohio 1995) ................................30

Willard v. Humana Health Plan of Tex., 336 F. 3d 375 (5th Cir. 2003) ......................................21

## STATUTES

31 U.S.C. § 3729 (a)(1-2) ..................................................................23

31 U.S.C.A. § 3729 (a)(7)..........................................................29, 33, 32

31 U.S.C. § 3730(b)(4)(B) .................................................................3

31 U.S.C. § 3730(b)(5) ...................................................................9, 10

48 C.F.R. 52.246-15(a) ...................................................................25

Fed. R. Civ. P. 4(m).......................................................................5

Fed. R. Civ. P. 9(b) ............................................................... *passim*

Fed. R. Civ. P. 15(c) .....................................................................11

Fed. R. Civ. P. 15(a) ......................................................................5

## OTHER AUTHORITIES

5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure:
    Civil § 1297, at 590 (2d ed. 1990) .........................................................12

## INTRODUCTION

This case concerns certain reckless practices by an aerospace manufacturer and the risk that its products present to pilots and passengers. The relators who are bringing this case are both highly knowledgeable quality control professionals. Between them they have almost fifty years of experience in quality, and they are very well acquainted with the processes and controls that are required for aerospace products. They are also very well situated to know of the specific manufacturing violations that are at the heart of this case. Each of them worked for RRC for six years, each of them personally observed the violations that they complained about, and each of them was terminated *after* he reported the violations.

Their allegations are specific and detailed, and numerous data points corroborate them. Indeed, there are more than thirty specific examples of quality violations pleaded in the Second Amended Complaint ("2AC"). Relators provide the particulars of time and place and the substance of the violations -- the "what," "when" and "where," and they identify the persons and entities "who" were responsible. Even further, Relators supply citations to the relevant portions of RRC's internal "Major Quality Failure" log ("MQF") where many of these quality control violations are documented.

While that is a lot, it admittedly is not enough. If that was all Relators pleaded then RRC would have a point because manufacturing violations, no matter how egregious, are not, by themselves, enforceable under the False Claims Act. But Relators' 2AC does not just plead the manufacturing violations. They have also gone on to tie the violations to false claims by pleading the "why" and "how" of a fraud. They explain why the particular manufacturing lapses are a contractual violation and why the violation is material, pointing out the relevant aerospace standards and the relevant contractual terms incorporating them. They also plead how the

1

violations resulted in false claims, identifying four claims or statements about the violations and explaining why each one was rendered false by the violations.

With that addition, the 2AC is ample under Rule 9(b). RRC's motion calls for yet more to avoid dismissal, but, as the Seventh Circuit has repeatedly made clear, requiring more would only thwart *qui tam* enforcement without materially advancing the purposes of Rule 9(b). See United States *ex rel.* Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009) (a relator who alleges the particulars of defendant's contract violations does not need to have actual invoices at the outset of the suit because such a requirement would improperly limit whistleblowers to employees in the billing department and take an unnecessary "bite out of *qui tam* litigation").

Faced with this background law and Relators' ample allegations, RRC takes an improper tack on a motion to dismiss: it tries to discredit the allegations. It calls the case "an implausible tale," and tries to diminish the Relators by calling them "opportunists." Worse, RRC resorts to painting a misleading picture of the record to justify its credibility attack.

First, while RRC says the FAA and DCMA "did not agree with McArtor's assessment [of quality concerns]," the Federal Aviation Administration ("FAA") investigated McArtor's reports and found "significant discrepancies related to air carrier safety" and required RRC to take "immediate corrective action." See FAA Letter, attached as Exhibit ("Ex.") 1; Dkt. No. 59, Ex. 7 (RRC's prior motion to dismiss).  As for the Defense Contract Management Agency ("DCMA"), it did no investigation at all. It wrote a memo a mere three days after McArtor made his report and stated that it would allow RRC to investigate itself. Dkt. No. 59, Ex. 6; 2AC ¶ 117.

Second, RRC also misuses the government's declination decision, treating it as if it were a determination of the merits. Not so. When Congress enacted the False Claims Act ("FCA") it did so knowing that government officials may decline intervention for a variety of reasons that

affect government agencies and their allocation of resources, but which do not reflect the merits. So it allowed whistleblowers to prosecute declined cases. 31 U.S.C. § 3730(b)(4)(B). Relators in declined cases have gone on to recover more than half a billion dollars for the treasury and expose contractor fraud and malfeasance that the agencies missed. See Fraud Statistics Overview, U.S. Dep't of Justice, attached as Ex. 2, at 2. Hundreds of millions of dollars more have been recovered in cases where the government initially declined but later intervened based on discovery the relator conducted. E.g. United States ex rel. Tyson v. Amerigroup, 488 F. Supp. 2d 719 (N.D. Ill 2007) ($335 million jury verdict in case where government declined until the eve of trial; settled for $225 million); United States ex rel. Robinson v. Northrop Grumman Corp., 89-c-6111 (N. D. Ill) ($62 million; government declined until discovery completed). Just like RRC, the contractors in those cases convinced an official not to act on the whistleblower's allegations, but discovery and a jury verdict eventually proved their misconduct. Thus, the Court should look well-past RRC's attempts to belittle Relators and their concerns raised in the 2AC.

At base, Relators have supplied ample particulars demonstrating how RRC's delivery of goods that were manufactured and tested improperly resulted in false claims. Not only are Relators' allegations legally sufficient at the pleadings stage, there are also many corroborating facts: the MQF Log, the FAA findings, the fact that Relators had not met each other but observed RRC's malfeasance independently, and, unfortunately, the legacy of engine failures – at least nine non-combat failures of military engines and at least nine additional failures on the equivalent civilian models since 2002.[1] For all these reason, and for the many others set out below, RRC's motion should be denied in its entirety.

---

[1]  The engines at issue in this case are ones made for the military but the same engine models used are manufactured for civilian use using the same production lines and processes. 2AC ¶¶ 81-85. Known lawsuits concerning these failures include: Ray, et al., v. Bell Helicopter Textron, Inc., et al., Circuit Court for Knox County, Tennessee, Docket No. 2-79-11; Winward Aviation, Inc., et al., v. Rolls-Royce Corp., Second Circuit Court of Hawaii, No. 10-1-0520; PHI, Inc. v. Rolls-Royce Corp., W.D.La., No.

## FACTS

The allegations at issue on this motion to dismiss are contained in Relators' 53-page Second Amended Complaint. It is neither possible nor necessary to restate every allegation in this brief.  Relators provide a brief summary of the procedural history and outline of the claims below, and then cite the relevant allegations in the Argument section.

### A.      Background on McArtor and Ramsey

McArtor has a Bachelor of Science degree in Quality Control Engineering, and over 20 years of experience as a quality professional in the aerospace industry. 2AC ¶ 16. From 1994 until his retaliatory firing in 2006, McArtor worked for RRC and its predecessors as a Regulatory Compliance Specialist, Senior Manager of Quality Assurance, and as the Organizational Designated Airworthiness Representative ("ODAR") Coordinator. Id. As the ODAR Coordinator from 2002 to 2006, McArtor served as RRC's representative to the FAA concerning RRC's quality compliance, and reported directly to William Kleiner, the Vice President of Quality. Id. ¶¶ 16, 20. Through his various roles, including ODAR Coordinator, McArtor has intimate knowledge of RRC's quality assurance obligations and its level of adherence to those obligations over time. Id. ¶ 16.  Further, McArtor is knowledgeable about RRC management's awareness of QMS violations and its failure to remedy them. Id. ¶¶ 16, 127.

Like McArtor, Ramsey is an experienced quality control professional with over two decades of experience as a manufacturing and quality engineer for complex industrial processes. 2AC ¶ 17.  He holds a Bachelor of Science degree in Automotive Industrial Technology, a Masters of Science degree in Technology Management for Quality Systems, and he is certified

---

6:08 Civ. 1406; West v. Rolls-Royce Corp., et al., D.N.H., No. 10 Civ. 214; Younan, et al., v. Rolls-Royce Corp., S.D.Ca., No. 3:09 Civ. 2136; Carter, et al., v. Goodrich Pump & Engine Control Sys. Inc., et al., N.D.Tex., No. 3:09 Civ. 2297-N; Laugelle v. Bell Helicopter Textron, Inc., et al., D.Del., No. 1:10 Civ. 1080; Carbajal v. Bell Helicopter Textron, Inc., et al., Miami-Dade County Civil Court, No. 2008-19562-CA-01; Mora v. Bell Helicopter Textron, Inc., et al., Miami-Dade County Civil Court, No. 2008-19870-CA-01; and Posados Garcia v. Bell Helicopter Textron, Inc., et al., Miami-Dade County Civil Court, No. 2008-19559-CA-01.

by the American Society of Quality. Id.  After almost two decades at aerospace and automobile manufacturers, Ramsey started at RRC in 2000. Id.  During his six years at RRC as a Quality Engineer, Ramsey oversaw quality compliance in numerous stages of the manufacturing process; in that role, Ramsey had intimate knowledge of RRC's quality compliance obligations and observed specific actions RRC took to circumvent those obligations. Id. ¶¶ 17, 129.

### B. The Original and Amended Complaints

McArtor filed the Original Complaint ("OC") on February 1, 2008. After the government declined to intervene and the case was unsealed, Ramsey read about the case in news reports and he contacted McArtor to share additional information supporting the claims and disclosed his knowledge to the government. 2AC ¶ 128. Based on the information, McArtor filed an Amended Complaint ("AC") containing the same claims as the OC, but including Ramsey's additional information and adding Ramsey as a co-relator.[2]

### C. The Second Amended Complaint

After several extensions of time to answer, RRC moved to dismiss under Rule 9(b) and for lack of jurisdiction, and Relators filed their response. Unsatisfied with its hand, RRC then sought leave to take one-way discovery to find grounds to support its effort at a dismissal. The Magistrate Judge denied RRC's request but ordered Relators to file an amended complaint breaking out the claims known to McArtor from those known to Ramsey. (Dkt. No. 74 at 9.)

In compliance with that order, Relators filed a 2AC that identified the allegations known to each relator but which otherwise tracked the AC.[3] See 2AC § VII (setting forth direct and

---

[2]  RRC insinuates that Relators violated the Court's order by not immediately serving the OC. That is unfair. The order set no deadline, and Relators served the OC and AC well within the time allowed under Fed. R. Civ. P. 4(m), the rule governing the time for service. Further, Relators' amendment was as of right under Fed. R. Civ. P. 15(a); RRC had no grounds to object.

[3]  RRC characterizes the 2AC as Relators' third "bite at the apple" and disingenuously criticizes Relators for "add[ing] very little by way of detail" in the 2AC. RRC's Memorandum in Support of the Motion to Dismiss ("Def. Mem.") at 3, 6. In point of fact, the Magistrate Judge did not grant Relators leave to make

independent knowledge of each Relator for each of his claims). Briefly summarized, the 2AC –
like the AC and OC – concerns two forms of malfeasance.

The first is RRC's failure to adhere to contractually-required quality control procedures
during manufacturing. The 2AC identifies the specific quality control requirements at issue, 2AC
¶¶ 36-44, and it gives numerous examples of RRC's violations, such as:

-   RRC skipped required tests for the AE3007 engine (MQF 06M004), 2AC ¶ 51;

-   RRC skipped review process and installed defective turbine wheels in Model 250 engines
    (MQF 03F030), 2AC ¶ 95.b;

-   RRC moved 41 of its 51 manufacturing lines at Plant 5 ("Project Evolution") but skipped
    first article and component proving tests (both contractually required) in order to save
    money and speed production on those lines, 2AC ¶ 55; and,

-   Multiple and repeated failures to conduct required tests (MQF 04F001, 004, 007 and
    010), 2AC ¶ 52.

These are but a few examples from the 2AC.  For most examples, Relators provide citations to
the internal RRC documents used to track product defects and process failures, called the "Major
Quality Failure Log," see, e.g., 2AC ¶¶ 52, 54, 80, 95, which support their allegations.

The second form of malfeasance concerns RRC's handling of "quality escapes" – defects
in aircraft engines and parts sold to the government that have entered into use in the field. 2AC
¶¶ 9, 64. Relators allege that RRC kept two sets of books on quality escapes. Id. ¶ 11, 73. One set
was for the defects that it told the government about; the second, which it called the "Records-
Only MRBs" was for escapes that RRC's managers unilaterally decided could be used "as is" in
the field. Id. The problem is that RRC was contractually obligated to tell the government about
every defective item and let the government make the call about whether it should be used. Id. ¶¶
65, 67. Aside from violating RRC's contracts, the Records-Only MRB was dangerous, as RRC
managers made risky decisions about which defects could be used "as is."  For example:

---

wholesale changes to their complaint and, more fundamentally, no court has ruled that the allegations of
the OC, AC or 2AC are insufficient to meet the pleading standard.

- RRC used it to avoid a recall of AE2100 engines despite the fact that the engines had a thin casting wall and voids that could lead to cracks, 2AC ¶74.a;

- RRC used it to conceal that it had sold the government Model 250 Engine turbine shafts (used on the Kiowa Warrior and MH 6 Little Bird) with a "case on core" condition that weakened the shaft, 2AC ¶74.c; and,

- RRC used it to withhold 35 separate quality escapes from the government while RRC discussed amongst a tightly controlled group of upper management (the "PPR" team) whether it wanted to make any disclosure at all.  2AC ¶¶ 75-79.

RRC also violated the contract requirements by adopting an internal practice it called "buying off" defects. Quality control rules incorporated into the contracts required RRC to send all defective parts through a formal evaluation and to inform the government before using them. 2AC ¶ 94. RRC avoided this process by allowing manufacturing managers to unilaterally move "out of tolerance" parts – those failing to meet specifications set by the design engineers – through the manufacturing process. 2AC ¶¶ 100-110.  See also id. ¶ 95 (listing products that RRC shipped with known defects and scrap parts).

The 2AC alleges four types of false claims arising out of RRC's ongoing manufacturing violations: fraudulent inducement of contracts (Claim A), reverse false claims stemming from RRC's cover-up of defects and quality escapes (Claim B), false certifications stemming from RRC's quality control testing breaches (Claim C), and fraudulent inducement associated with the 2005 recertification effort for RRC's quality control system (Claim D). 2AC ¶¶ 130-147.

### D.    The Employment Dispute Between RRC and McArtor

Although RRC attempts to portray this lawsuit as a grudge match between itself and former employees with an "axe to grind," Def. Mem. at 2, 14, the Second Amended Complaint, taken as true at this stage, tells a very different story.

 McArtor was employed with RRC's affiliate, Rolls-Royce Geared Systems, and then RRC, where he worked in regulatory compliance and quality control. 2AC ¶¶ 16, 18. After RRC took over the former Alison Engine plant in Indianapolis in 2000, it brought in new management

with different beliefs about quality control.  They emphasized speeding production and reducing costs over regulatory and quality compliance.  Id. ¶¶ 20-22; 33-35, 45-48.

They quickly took away the independence of the Quality department, putting it under Operations, where the manufacturing managers took over and emphasized their production agendas. Id. ¶¶ 58-60.  McArtor, a career-long quality control professional, disagreed with the changes, knowing that placing quality assurance in the hands of manufacturing presented inherent conflicts that would lead to a deterioration of the quality controls.  Id. ¶ 60-62

In 2005, William Kleiner, the Vice President of Quality and McArtor's boss, changed the process for dispositioning defective parts and engines.  The new process (called "PPR") excluded the ODAR Coordinator (by then, McArtor) who had previously been involved, and Kleiner thus kept the information about defects amongst only upper-management.  Id. ¶¶ 75-78, 114-15.

McArtor spoke out about the change.  2AC ¶¶ 111-118.  Kleiner told McArtor that he should not report his concerns to anyone in writing. Id. ¶ 113. For over eight months, McArtor relied on Kleiner to provide him information about defects revealed in the PPR process but Kleiner lied to him, concealing 35 separate quality escapes.  Id. ¶¶ 114-15. When McArtor learned of this fact, he was alarmed and suggested that RRC take containment measures including a temporary stop shipment. Id. ¶ 116. When Kleiner refused, McArtor informed the FAA and DCMA about the quality escapes. Id. ¶ 117. McArtor was right to go to the government: the FAA found "significant safety discrepancies" based on the problems McArtor identified, and instructed RRC to take "immediate corrective action." Ex. 1. McArtor's efforts to ensure compliance, however, cost him his job.  Within days of reporting his concerns to the FAA, he was placed on administrative leave and then fired. 2AC ¶¶ 117-19.

Far from the disgruntled ex-employee with an implausible tale, McArtor took his complaints to his managers, and to the government when RRC did nothing, while he was still

employed by RRC.  And he is no opportunist – he went to his managers, and to the FAA and DCMA, long before he ever filed an FCA lawsuit.

### E.   RRC's Similar Treatment of Ramsey

Ramsey, too, is a victim of retaliation. Contrary to RRC's assertion that Ramsey first raised his quality concerns in the Amended Complaint, Ramsey in fact first blew the whistle on RRC's quality control violations back in 2004. 2AC ¶ 122. At that time, he informed his supervisor, Jack Reismiller, the Director of Operations-Quality, that RRC was regularly using defective parts and equipment in the manufacturing process. Id. Reismiller threatened Ramsey's job and told him that any further reports would ruin his career. Id. Ramsey informed Deborah True, then Vice President of Quality, and she assured Ramsey he was protected. However, True left RRC in 2005, was succeeded by Kleiner, and within a year Ramsey was fired. Id. at ¶ 123.

When McArtor's claims were unsealed and Ramsey saw the connection to what he had reported while at RRC, he immediately came forward, disclosed his knowledge to the government, and then joined this lawsuit. 2AC ¶ 128. Thus, like McArtor, Ramsey did not invent a story after he was fired to get back at RRC.  Quite to the contrary, he presented his concerns to management while he was still very much employed and well before bringing this suit.

### ARGUMENT

## I.   The First to File Bar Does Not Apply Here

Both the plain language of the "first-to-file" bar and its legislative purpose show that it is not applicable here.

Starting with the text, the plain language of the statute prohibits only "interven[ing] or bring[ing] a related action." 31 U.S.C. § 3730(b)(5). Ramsey has done neither. To the contrary, the initial relator has permissively joined Ramsey by amending his complaint to include Ramsey.

Section 3730(b)(5) does not prohibit voluntary joinder by the person who initially filed the suit. United States ex rel. Precision Co. v. Koch Indus., Inc., 31 F.3d 1015, 1017 (10th Cir.

9

1994) ("[T]he [first-to-file bar] implies intervention of the types set forth in Rule 24(b)(2), and the addition of parties does not constitute intervention."); United States *ex rel.* Howard v. Lockheed Martin Corp., 1:99-cv-285, 2011 WL 4348104, at *1, 4 (S.D.Oh. Sept. 16, 2011) (stating that "policy considerations favor Relators" in rejecting application of first to file bar against relators that joined lawsuit by amendment); United States *ex rel.* Sanders v. East Alabama Healthcare Authority, 953 F. Supp. 1404, 1408 (M.D.Ala. 1996) (stating that Section (b)(5) prohibits private party intervention but "does not automatically bar the addition of new parties" in allowing the joining of a new relator by amendment).

Moreover, RRC's argument that other circuits reject Koch's plain language interpretation and supposedly prohibit joinder is incorrect. Def. Mem. at 10 n. 6. The cases RRC cites are inapposite and none of them even address Koch's reading of Section (b)(5).  See United States *ex rel.* Lujan v. Hughes Aircraft Co., 243 F. 3d 1181 (9th Cir. 2001) (bar applied to successively filed lawsuit alleging same fraud as separate pending lawsuit; no mention of Koch); United States *ex rel.* LaCorte v. Wagner, 185 F.3d 188 (4th Cir. 1999) (bar prevented intervention by relators from one lawsuit to claim a portion of settlement proceeds in another lawsuit; no mention of Koch); Fed. Recovery Servs., Inc. v. United States, 72 F.3d 447 (5th Cir. 1995) (court criticized a separate ruling in Koch, inapplicable here, that allowed amendment when there was no jurisdiction over the original relator; no mention of Section (b)(5)).

This is unsurprising. Voluntary joinder is in complete harmony with 3730(b)(5)'s purpose, which is to protect the government's interests in two ways. First, by barring intervention or a separate suit, it prevents interlopers from weakening a whistleblower's incentive to come forward by divesting the original whistleblowers stake in the case. See United States *ex rel.* Chovanec v. Apria Healthcare Group Inc., 606 F.3d 361, 364 (7th Cir. 2010) ("Me-too suits designed to divert some of the reward to latecomers do not serve any useful purpose,

10

and they weaken the incentive to dig out the facts and launch the initial action."). Permissive joinder presents no such risk because it cannot occur without the consent of the original whistleblower. Second, the bar prohibits additional suits so that the government is not required to pay multiple whistleblower bounties. Id. ("[S]econdary suits that do no more than remind the United States of what it has learned from the initial suit deflect recoveries from the Treasury to rewards under § 3730(d). . . . If a suit makes a claim for compensation without revealing anything new, then it is sensible to block it."). Where multiple relators are joined on the same claim this concern is not implicated at all as the relators split the bounty. In fact, McArtor and Ramsey could have joined as co-relators *ab initio* had they know each other initially. E.g., United States *ex rel.* Fallon v. Accudyne Corp., 97 F.3d 937 (7th Cir. 1996) (six relators filed together); Kennard v. Comstock Resources, Inc., 363 F.3d 1039 (10th Cir. 2004) (first relator solicited second relator to investigate facts of suspected fraud and then filed suit); United States *ex rel.* Mccoy v. Madison Center, 2011 WL 1791710 (N.D. Ind. May 9, 2011) (two relators); In re Pharm. Indus. Average Wholesale Price Litig., 2010 WL 1375298, at *3 (unrelated co-relators working for different companies were each "original sources" of information underlying defendant's fraud); United States *ex rel.* Kennedy v. Aventis Pharm., 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007) (two pharmaceutical sales representatives observed separate evidence of off-label marketing and joined as co-relators).

Finally, RRC argues in passing that the claim is untimely, Def. Mem. at 11 n.7, but that is not so. The claim in which Ramsey now joins was filed in February 2008, well within the statute of limitations. That Ramsey has been joined as a party on a timely claim does not effect the timeliness analysis. Moreover, even if Ramsey has to separately satisfy the statute of limitations (even though RRC is not affected one iota by the fact that there is an additional relator on the same timely claim) the relation back provision of Fed. R. Civ. P. 15(c) is satisfied. Id. Because

Ramsey is simply being added to an extant and timely claim he clearly "asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . .in the original pleading." Id.; Sanders, 953 F. Supp. at 1408.

For all of these reasons, the first to file bar does not apply here, and RRC's request to dismiss Ramsey should be denied.[4]

## II.    Relators satisfy Rule 9(b) by pleading the circumstances of dozens of instances when RRC violated its Quality Management System and tying these violations to contractual requirements for payment

Rule 9(b) is not as high a hurdle as RRC suggests.  Whistleblowers routinely survive Rule 9(b) challenges by alleging the same type of facts at bar. See, e.g., Lusby, 570 F.3d at 854. Relators' 2AC is no exception.

### A.    Applicable Standard

This Court discussed the required standard under Rule 9(b) in United States *ex rel.* Leveski v. ITT Educ. Serv., Inc., 1:07-cv-867-WTL-JMS, 2010 WL 1936118 (S.D. Ind. May 12, 2010) (Lawrence, J.): "The purpose of Rule 9(b) is 'to ensure that the party accused of fraud, a matter implying some degree of moral turpitude and often involving a 'wide variety of potential conduct,' is given adequate notice of the specific activity that the plaintiff claims constituted the fraud so that the accused party may file an effective responsive pleading.'" Id. at *3.

Under the Rule, a relator must provide sufficient details of the false representation (sometimes called the "who, what, where, why and when" of the fraud) to allow the defendant "to identify the conduct and respond."  Id.  See also 5 Charles Alan Wright and Arthur R. Miller,

---

[4] RRC's request that the Court strike specific information known to Ramsey from the Second Amended Complaint is even more flawed. Def. Mem. at 11. Rule 9(b) is not concerned with the source of an allegation. It looks only to whether the allegations are sufficient to apprise the defendant of the nature of the fraud so that it can prepare a responsive pleading. Thus, whether or not Ramsey is a relator in this case, McArtor is entitled to include the information in a pleading and rely upon it to show that the pleading is sufficient. Moreover, RRC's motion does not attack jurisdiction as to McArtor anyway. And, even if it did, original source status can be evaluated perfectly well without striking allegations that McArtor admits did not originate with him. That is the basis of the Magistrate Judge's decision to have Relators break out their claims in the SAC.

Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990) (The "circumstances" required to be pled are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.").

Importantly in FCA cases, a relator's burden extends to the circumstances constituting the fraud but does not include the specifics of a claim for payment. The Seventh Circuit has examined the role of Rule 9(b) in a case very similar to this one, involving quality control violations at RRC and where RRC made many of the same arguments it is raising here. The Court concluded that employee whistleblower need only plead the particulars of the conduct that renders the claims false. Lusby, 570 F. 3d at 854. The Court found that requiring an employee to also plead the particulars of the claim would "take a bite out of" *qui tam* litigation because few if any employees would be directly involved in both the manufacturing process where the violations were occurring and in the billing process. Id. Because a requirement to plead the particulars of a payment claim would inhibit the fraud enforcement that Congress sought in the FCA, without substantially furthering the purposes of Rule 9(b), the Court rejected RRC's arguments for such a pleading requirement. Id. ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit.").

**B.      Relators Allege the Specifics of the Underlying Quality Control Violations**

The 2AC focuses on two principal obligations that all aircraft manufacturers must follow: (1) quality controls in the manufacturing process, and (2) reporting requirements when the manufacturer learns that its product has a defect.  These obligations flow from the mission critical nature of the products that aircraft companies sell. 2AC ¶ 1. These quality controls are set out in the internationally-accepted aerospace standards, AS 9100 and ISO 9001, 2AC ¶ 31, and are incorporated into RRC's QMS. Id. ¶¶ 4-35 . In section III.C, below, Relators cover the allegations which show why RRC is required to adhere to these standards when producing

aircraft engines for sale to the government (by pointing to the provisions in its government contracts that mandate compliance). In this section, Relator covers the allegations explaining what the standards require and how RRC was violating them.

*Manufacturing Process*

Regarding quality controls in the manufacturing process, the 2AC identifies five standards that RRC violated: Source and Method Change Procedures, First/Last Article Inspections, Component Proving, Source and Receiving Inspections, and Design and Manufacturing Inspections. 2AC ¶¶ 37-42. Relators go on to allege many specific instances of these violations. See id. ¶¶ 49-58 (violations of manufacturing requirements).[5]  For each instance, Relators have provided the requisite particulars and, for many, provide citations to RRC's internal MQF log identifying the violation.  For example, MQF 06M004 was initiated in March 2006 concerning the failure to perform First Articles Inspections and Component Proving for AE3007 engines, id. ¶¶ 51; and MQF 04F010, initiated in March 2004, demonstrates the systemic nature of the problem by citing the failure to perform Source and Method Change Procedures *across all engine families and models*, and referencing earlier MQF entries concerning the same issue (04F001, 04F004, 04F007). Id. ¶ 52.

Relators also identify specific cost-cutting programs that resulted in further violations. For example, RRC initiated the "Cost Excellence" project to reduce costs by eliminating critical quality controls, and the changes stemming from this program were not tested using required First Article Inspections and Component Proving. 2AC ¶ 53 (and engineers on the project complained to McArtor of intense pressure to eliminate critical quality controls). MQF Log

---

[5]  When a defendant is alleged to have engaged in misconduct occurring over the course of years, Rule 9(b) requires the relator to supply only representative examples. See Mason v. Medline Indus. Inc., 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010) ("A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples.").

06M017 documents an instance – involving the HiSTED development project – in which the Cost Excellence initiative resulted in the failure to perform required testing. Id. ¶ 54.  Another example is "Project Evolution," a cost reduction program in 2005 in which RRC moved 41 of 51 manufacturing lines at Plant 5 but skipped required First Article and Component Proving tests in order to save money and speed production. Id. ¶ 55.  Relators even provide specific details on the magnitude of the violations: in total, only four First Article Inspections were conducted from 2002 to 2005 on thousands of RRC-manufactured parts, and only 40% of supplier-manufactured parts were subjected to First Article Inspections. Id. ¶ 50.

*Defect Reporting*

Relators also explain the processes by which RRC violated the defect reporting requirements: the Records-Only MRB, the PPR teams, and "buying off" defects. 2AC ¶¶ 63-79; 98-106. Relators provide numerous examples, which, by and large, are further grounded in the MQF log. For example, RRC used the Records-Only MRB process to conceal quality escapes involving AE 2100 gearboxes that had a thin casing wall; T56 engines manufactured using a defective welding process; Model 250 engine turbine shafts with a "case on core" defect; Model 250 turbine shafts with defective splines; and AE1107, AE2100 and AE3007 engines damaged by use of an improper solution. 2AC ¶ 74.a-e.  Relators also identify MQF Log entries that specify instances in which parts clearly identified as defective (for test or scrap-use only) – including Model 250 turbine wheels, AE3007 front frame studs and T56 bearings – were nevertheless sold to DoD. Id. ¶ 95.  In sum, through its defect reporting violations, RRC withheld 35 separate quality escapes from the government by keeping such information within a tightly-controlled group of upper management (the "PPR" team). 2AC ¶¶ 75-79.

Finally, the 2AC identifies the RRC managers who caused the violations or who knew of them and allowed them to continue, including Steve Dwyer, John Gallo, Bill Kleiner, Jack

15

Reismiller, James Leonard, and David Fetsko, as well as manufacturing supervisors that reported to these managers. 2AC ¶¶ 20-22, 35, 46, 60, 77-79, 86-93, 107-09. The 2AC describes their involvement and knowledge. E.g., id. ¶ 46 (Kleiner made it clear that RRC management was knowingly disregarding its QMS when he told McArtor that if RRC adhered to "over-reaching inspection regimes" it would lose to the competition), 111-14, 121-25 (multiple examples of management's retaliation against whistleblowers who spoke out about quality violations).

### C.     Relators Also Ground the Quality Requirements In RRC's Contracts

RRC does not deny that it committed the foregoing violations or even that they are not, in and of themselves, well-pleaded. Rather, RRC's argument is that the 2AC's allegations are insufficient to demonstrate that the quality control requirements were part of RRC's contractual obligations to the government.  Thus, according to RRC, Relators have failed to show that the alleged quality control violations result in false claims. The argument is incorrect.  It ignores numerous allegations in the 2AC and badly misreads others. Relators explain as follows:

*The QMS*

An aerospace manufacturers that sell to the government, such as RRC, is required to maintain a rigorous quality control plan that sets forth in detail the quality tests and inspections that will be performed to minimize defects and ensure the detection of those that do occur. RRC's plan is called its Quality Management System, or QMS. The QMS incorporates Aerospace Standards 9100 ("AS 9100"), an internationally-accepted and highly rigorous quality standard for the aerospace industry. 2AC ¶¶ 29-35.

After acquiring Allison Engine's Indianapolis plant in 2000, RRC began implementing QMS at the RRC Indianapolis plant. 2AC ¶ 33. It obtained third-party certification that its QMS met AS9100 standards in 2002, and then obtained DoD approval of its QMS that same year.  As discussed below, from that point RRC was contractually obligated to adhere to its QMS and the AS9100 standards it incorporated. Id.  ¶¶ 30, 34-35.

16

### *RRC's Contracts Required QMS Compliance*

RRC's accusations aside, Relators are quite familiar with the contract terms that govern RRC's quality control obligations and they have accurately alleged them. RRC is plainly required to follow AS 9100 standards; and its entire argument to the contrary is a strawman.

Relators' 2AC starts, quite correctly, with the allegation that RRC is required submit a quality assurance plan to the DoD for approval, 2AC ¶¶ 28-36, and that the system must meet "internationally-accepted standards such as . . . [ISO] 9001 and [AS] 9100." Id. ¶ 31 (RRC in no way contradicts this allegation; it just ignores it to build its strawman.) From there, Relators allege that RRC incorporated AS 9100 standards in its quality assurance plan, called its QMS, and that DoD approved that quality assurance plan. Id. ¶¶ 34-35 (RRC simply ignores these allegations too). Finally, Relators correctly allege that RRC's contracts require it to comply with the QMS and, thus, the AS 9100 standard incorporated therein. Id. ¶¶ 29-30, 35, 98, 132-34.

This allegation is correct and, again, RRC never contradicts it.  In fact, the allegation is substantiated by the 2AC's example contracts. Relators pleaded that RRC's contracts incorporate FAR 52.246, 2AC ¶¶ 29, 132-34, and each of the example contracts bears this out. See Example Contracts, Def. Ex. 1 at 25 (incorporating FAR 52.246-2,4); Def. Ex. 2 at 7 (incorporating FAR 52.246-2,4); and Def. Ex. 3, at 8 (incorporating FAR 52.246-3,5). Relators also allege that the FAR makes compliance with the QMS a term of the contracts, and that is what the FAR says:

> The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements.

FAR 52.246-2; 2AC ¶ 98; see also FAR 52.246-3,4,5. The inspection system referenced in the FAR provision is RRC's QMS. 2AC ¶¶ 28-36.

Only by ignoring all of these allegations and taking a separate contract provision out of context does RRC argue that Relators are mistaken about what the contracts say. What RRC has done is to single out a portion of the example contracts that references ISO 9001. Def. Mem. at 16. From there, it claims that Relators' pleadings about AS 9100 are incorrect and that Relators must be guessing (a "no no" under Rule 9(b)). But the argument is a strawman.

The two contract requirements can and do coexist and they are perfectly consistent. The provision RRC cites, "Higher-Level Quality Requirements," sets out the minimum standards that a contractor's inspection system must meet in order to qualify for the contract, stating that the contractor "shall comply with the higher-level quality standard . . . [ISO] 9001 . . . *or comparable system*." Def. Ex. 1 at 25 (emphasis added). As Relators allege, AS 9100 is a higher-level aerospace contracting standard and *it incorporates ISO 9001*. 2AC ¶ 32. RRC does not, and cannot, contradict this fact. Thus, a quality system that complies with AS 9100 also "compl[ies] with the high-level quality standard [of] ISO 9001." In fact, the entire reason that RRC got the QMS certified under AS 9100 was so that it could meet the higher-level contracting requirements. 2AC ¶ 34. Put simply, the provision RRC cites establishes ISO 9001 or its equivalent as the minimum standard for an approved quality management system under the contract, while the provision Relators cite makes compliance with the DoD-approved quality management system a requirement of the contract. The two are consistent and complementary.

Thus, RRC's attempt to contradict Relators' allegation is itself based on a misconstruction of the pleadings and the contracts themselves (all in a manner that RRC no doubt realizes[6]). The argument fails to withstand scrutiny and with it falls one of RRC's central tenets for why Relators supposedly fail to satisfy Rule 9(b).

---

[6]  RRC absurdly claims that Relators admitted to a "lack of familiarity" with contract requirements in the prior round of briefing. Def. Mem. at 17. Hardly. Relators are very well aware of how the contracts work, having worked in the industry for decades. What they were arguing in the prior briefing was that RRC

**D.    The False Statements**

So, Relators have alleged the contractual particulars showing that the federal government

expected RRC to comply with the QMS, including AS9100 standards, and Relators have

provided dozens of examples showing how RRC routinely violated these commands.  The

remaining piece that Relators must show under Rule 9(b) is the existence of statements which are

rendered "false or fraudulent" by these violations. Relators allege four types of false statements

that RRC made and they provide the "circumstances of the fraud" as to each one.

### 1.    Fraudulent inducement of post-2002 contracts (Claim A)

It is hornbook law that a person who makes a contractual promise without intending to

perform it is guilty of common law fraud. Perlman v. Zell, 185 F.3d 850 (7th Cir. 1999); Bower

v. Jones, 978 F.2d 1004, 1012 (7th Cir. 1992); Restatement (2d) of Torts § 530(1) (1977) ("A

representation of the maker's own intention to do or not to do a particular thing is fraudulent if he

does not have that intention."). FCA cases recognize this same theory because a promise without

the intention to perform is a false statement. See United States *ex rel.* Main v. Oakland City

Univ., 426 F.3d 914 (7th Cir. 2009) (university violated FCA by promising not to pay recruiters

contingency fees when it intended to do so) *cert. denied*, 547 U.S. 1071 (2006).

Here, Relators allege that RRC promised in its contracts to follow its QMS, 2AC ¶¶ 29-

30, 35, and that it did not intend to comply when it made those promises. Id. at ¶¶ 35, 131.

Relators also identify the FAR provisions mandating QMS compliance, id. at ¶¶ 29-31, and they

provide three example contracts over the course of several years that include the promise of

QMS compliance. Id. at ¶¶ 132-34. Taken together with the record of non-compliance that

Relators establish, these allegations amply plead the circumstances of fraud in the inducement.

See Main, 426 F. 3d at 917 ("[I]f the University knew about the rule and told the Department that

---

shared that familiarity and therefore understood the AC's allegations. Their point was that RRC was
intentionally misconstruing the evidence and trying to take advantage of the court's lack of familiarity
with aerospace contracting. Dkt. No. 68, at 20.

it would comply, while planning to do otherwise, it is exposed to penalties under the False

Claims Act."); Mason, 731 F. Supp. 2d at 735 (Rule 9(b) requires only representative examples).

RRC's primary argument against these allegations is that they are insufficient to show

that RRC did not intend to perform when it made the promises. From the outset, this argument

should be quite circumscribed because Rule 9(b)'s heightened specificity requirement does not

extend to allegations of the defendant's intent. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge,

and other conditions of a person's mind may be alleged generally"). Rather, Relators need only

establish plausibility, Khorrami, 539 F. 3d at 788, and they have done much more than that.

They allege that RRC began violating the QMS within months after it obtained DoD

approval. 2AC ¶ 34. They provide numerous examples of non-compliance beginning in 2003

including: the failure to conduct Machine Tool Routing Verification, "buying off" defects, the

almost complete absence of first article inspections (only four inspections performed when there

should have been hundreds), among others, and they substantiate these with actual findings in the

MQF Logs. E.g. 2AC ¶¶ 47, 50, 56-58, 80, 95; see also 2AC ¶¶ 35, 131 (180 contracts were

entered into between 2003 and 2006). Moreover, this pattern of non-compliance continued into

2004 and 2005, further substantiating the inference that RRC never intended to adhere to its

QMS when it entered into the contracts. See, e.g., 2AC ¶¶ 53-55, 74-77, 80 (documenting MQF

log entries through 2005). These allegations of specific instances of QMS violations throughout

the period from 2003 to 2006, occurring simultaneously with RRC's repeated promises that it

would comply with the QMS, are more than sufficient to proceed past the pleadings stage. See

United States *ex rel.* Tyson v. Amerigroup Ill., Inc., 488 F. Supp. 2d 719 (N.D.Ill. 2007) (finding

sufficient evidence of intent where relator established that the defendant was already violating

non-discrimination rules when it entered into contract requiring adherence to those rules).

RRC's cases actually support Relators on this point. In <u>Willard v. Humana Health Plan of Tex.</u>, 336 F. 3d 375 (5th Cir. 2003), the relator alleged that the defendant entered into contracts to provide HMO service in rural areas, without intending to do so, because those contracts were a pre-requisite to obtaining lucrative contracts in urban areas. <u>Id.</u> at 379. The court found the relator's allegations insufficient because he did not allege that the defendant failed to serve the rural communities. <u>Id.</u> at 386. The court contrasted the complaint before it to one which alleged that the defendant breached its promise close in time to making it. <u>Id.</u> ("It must be shown that the defendant promptly followed through on its intent not to perform by substantially failing to carry out its obligations under the contract."). The court acknowledged that such evidence can also be coupled with evidence of statements of intent by the defendant's managers. <u>Id.</u> at 385.  Here, Relators present not only detailed allegations of violations close in time to the promises, they also provide a statement by Kleiner indicating that RRC had no intention of complying with the quality control standards because if it did it could not remain competitive. 2AC ¶ 46.

Likewise, RRC cites <u>United States <i>ex rel.</i> Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 377 (4th Cir. 2008), which concerned a promise where the standard for compliance was too imprecise to conclude that the promissor had even breached it (keeping trucks in "good condition"), much less that it intended not to comply with the standard when it made the promise. The court contrasted that to a case involving "objective falsehoods," like a failure to follow "a specific maintenance program for the convoy trucks" or to perform "specific acts of maintenance that KBR knew it lacked the capacity to perform." <u>Id.</u> Here, Relators allege that RRC made objective representations – including performance of first/last article inspections, component proving tests and other AS 9100 and QMS-required tests – that were not fulfilled. This is precisely the type of promise that <u>Wilson</u> held would satisfy Rule 9(b). <u>Id.</u>

Finally, RRC's argument that Relators have not provided enough information about the time, place and manner of the false statements, Def. Mem. at 15-16, is hollow. Relators have alleged the location and substance of the false statements: the contractual promise stating that RRC will comply with the QMS. Similarly, the maker of the statement is plain – RRC is the promissor. United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 506 (6th Cir. 2007) ("[T]he identity of the natural person within the corporate defendant who submitted false claims is not an essential element of a FCA violation. . . .Where, as here, the relator has alleged that the corporation has committed the fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the relator must necessarily plead with particularity.").[7]

Relators also adequately identify the time of the false statements, as these are the contracts entered into since DoD's approval of the QMS in 2002. Though this is a range of time rather than a list of each specific date, there is nothing improper in such an allegation. When a fraud occurs over the course of years, the relator's obligation under Rule 9(b) is to identify the time frame and provide examples of the false statements. Mason, 731 F. Supp. 2d at 735 (citing United States ex rel. Bledsoe, 501 F.3d at 509-10 and United States v. Ortho-McNeil Pharm., Inc., 03 C 8239, 2007 WL 2091185, *3 (N.D.Ill. July 20, 2007)). Relators cited three example contracts, ranging in date from December 2002 to August 2005, all of which contain the requirement that RRC follow the QMS. 2AC ¶¶ 28, 123-125.

In sum, Relators have provided ample details to show that these are not baseless allegations of fraud, and they have given RRC "adequate notice of the specific activity . . . claimed [to] constitute[] the fraud so that [it] may file an effective responsive pleading."

---

[7] RRC was partners with G.E. in the Joint Strike Fighter liftfan program, Contract N0009-04-C-0093, but that fact does not get RRC off the hook. As alleged in the 2AC, liftfan engine parts were manufactured by RRC at its Indianapolis plant, which is RRC's only plant. 2AC ¶¶ 6, 18-19.

Lachmund v. ADM Investor Servs., Inc., 191 F. 3d 777, 783 (7th Cir. 1999). The Rule 9(b)

standard is satisfied.

### 2.     False Certifications (Claim C)

Relators also allege that RRC made false claims for payment when it billed the

government for products that had not been produced and inspected in accordance with QMS

requirements. See 31 U.S.C. § 3729 (a)(1-2).

There are many examples in the 2AC of RRC manufacturing goods that did not conform

to the QMS: For one, RRC moved and retooled 41 of the 51 manufacturing lines at Plant 5,

under its "Project Evolution" cost reduction plan in 2005. 2AC ¶ 55. The QMS quality control

requirements dictated that RRC perform Source and Method Change Procedure tests, including

first article inspections, on each of these lines after this move. Id. However, as Relators allege,

and as confirmed by RRC operation manager Mike McKibbin, RRC skipped them. Id. For

another, the March 2006 MQF (No. 06M004) demonstrates RRC's failure to follow the required

first article inspections and component proving for the AE3007 engine, which it sold to DoD for

the RQ-4A Global Hawk. Id. ¶ 51. Yet another example is the March 2004 MQF (No. 04F010)

that documents RRC's failure to provide sufficient resources to conduct source and method

change procedures across all of its engine lines. Id. ¶ 52. These internal company documents

(and the many others cited in the 2AC) substantiate Relators' allegations of RRC's widespread

malfeasance when it came to its obligations to perform required but costly QMS quality controls.

The quality controls RRC abandoned are not only important, they are contractually

required, and the FCA gives those requirements teeth. RRC tries to argue that the FCA does not

apply because Relators supposedly fail to prove that certificates of conformance ("CoC") are

required. Def. Mem. at 23-24.  Granting that premise, for the moment, RRC's argument is still a

non-starter because the FCA applies whether or not there was an actual CoC.

Importantly, RRC does not contend that it did not bill the government for the untested products (nor could it). That fact of the billing alone is sufficient to trigger the FCA even if RRC did not include a certificate of conformance. A legion of caselaw holds defense contractors liable under the FCA when they know that their products are non-compliant with contract terms that require the manufacturer to test the products, but bill the government anyway. See, e.g., Lusby, 570 F.3d 849 (relator alleged FCA liability where RRC shipped turbine blades which did not conform to contract specifications); United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (finding FCA liability where manufacturer delivered brake shoes that had not been tested according to the procedure required in its contract); Daff v. United States, 78 F.3d 1566 (Fed. Cir. 1996) (finding FCA liability where contractor violated FAR 52.246 inspection requirements in order to speed production and then billed the government for progress payments as it delivered the uninspected products); United States ex rel. King v. DSE, Inc., 8:08-cv-2416, 2011 WL 1884012 (M.D. Fla. May 17, 2011) (finding FCA liability where defense contractor "failed to follow proper quality control procedures and shipped defective grenades"); United States ex rel. Lockhart v. General Dynamics, 529 F. Supp. 2d 1335 (N.D. Fla. 2007) (denying motion to dismiss on particularity grounds where the defense contractor systematically failed to perform quality control tests mandated in its contracts);[8] Fallon, 921 F. Supp. at 622 (finding FCA liability where contractor submitted requests for payment for goods that it had not tested in compliance with contractual requirements); see also S. Rep. No. 99-345, at 9, reprinted in 1986 U.S.C.C.A.N. 5266, 5274 ("[A] false claim may take many forms, the

---

[8] Lockhart is also instructive on the pleading standards. The court rejected the defendants' Rule 9(b) argument for greater particulars, stating: "To be sure, this complaint does not give dates or amounts of deliveries or payments. The fraud, though, was the failure to test and the failure to disclose the failure to test. One cannot give the date of an event that did not happen, or identify the person who made a disclosure that was not made. *The complaint specifically identifies the tests that were not conducted, and gives precise and credible information on how Mr. Lockhart knows what he alleges. This is sufficient to satisfy Rule 9(b).*" Id. at 1341 (emphasis added).

most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation."). RRC's position is contrary to this ample authority, all of which was presented in earlier briefing and which RRC continues to ignore.

Against the ample caselaw above, RRC's other main argument – that Relators fail to plausibly allege that RRC made any certification at all in connection with its sales – is equally baseless. RRC sets out to prove through citations to the federal regulations and the example contracts that CoCs were "optional, not mandatory." Def. Mem. at 24. But even if true, this does nothing to undermine the plausibility of Relators' allegations.

Some brief background on the FARs is helpful to highlight the flaw in this argument. When the government takes delivery of goods from a manufacturer like RRC, it does so in one of two ways. First, it can take delivery at the plant, in which case its inspection and acceptance occur there. Or, it can authorize the manufacturer to ship the supplies to the government with a CoC, in which case acceptance takes place without the government having first inspected the goods. 48 C.F.R. 52.246-15(a) ("When authorized in writing by the cognizant Contract Administration Office (CAO), the Contractor shall ship with a Certificate of Conformance any supplies for which the contract would otherwise require inspection at source."). See also 48 C.F.R. 46.504 ("A certificate of conformance (see 46.315) may be used in certain instances instead of source inspection (whether the contract calls for acceptance at source or destination) at the discretion of the contracting officer if . . . [a]cceptance on the basis of a contractor's certificate of conformance is in the Government's interest."). Compare UCC 2-606 (acceptance rules for goods in non-government contracting).

So RRC is correct that the government does not always require a CoC from a contractor. But RRC's conclusion that Relators have therefore failed to plausibly allege a false certification is wrong, and flips the burden on a motion to dismiss. Relators allege, based on their knowledge

as career-long quality professionals with substantial tenures at RRC, 2AC ¶¶ 16-17, that RRC submitted CoCs when delivering materials to the government, and the regulations confirm that CoCs can indeed be used in lieu of government inspection. The mere fact that the CoC is an option for the contracting officer does not mean that the government never used the CoC process with RRC. Indeed, RRC does not deny that it submitted CoCs to the government at least sometimes, which it did. In any event, Relators are not obligated to prove the CoC claim at this stage; only to plead it with sufficient particularity, which they have. See Lusby, 570 F. 3d at 854-55 ("To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement).") (emphasis in original).

Moreover, Relators' false certification claim applies even when the government chooses delivery onsite instead of a CoC. RRC does not have free license to sell the government untested and defective goods. Rather, under well-established law, the very act of billing the government for goods or services entails certain implied certifications (or certifications as a matter of law).

In the contract fraud realm, a contractor impliedly certifies that it is in compliance with the material terms of its contract whenever it submits a claim for payment.[9] Thus, if the contractor bills the government while knowing that it is in breach, it has made a false certification and is liable under the FCA. See United States v. Science Applications Int'l Corp., 626 F.3d 1257, 1269 (D.C. Cir. 2010) (finding liability for implied certification where a contractor submits a claim for payment while knowingly withholding "information about its noncompliance with material contractual requirements"); United States *ex rel.* Lemmon v.

---

[9] RRC gets it wrong when it cites a program fraud case, United States *ex rel.* Crews & Ill. v. NCS Healthcare of Ill., Inc., 460 F.3d 853, 858 (7th Cir. 2006), for the proposition that payment must be expressly conditioned on compliance with the allegedly violated requirement in order to find that the payment request constitutes an implied certification of compliance. That rule stems from the *program* fraud realm (like the healthcare claims in Crews) where there are thousands of rules that may or may not be material to the government's payment decision. In the contract realm, by contrast, substantial compliance with a material contract term is always a condition of payment. Thus the express condition rule does not carry over from the program to the contract realm.

Envirocare of Utah, Inc., 614 F.3d 1163, 1169 (10th Cir. 2010) (implied certification liability where contractor submitted a claim for payment while knowing that it was dumping hazardous waste in violation of the environmental requirements of its contract); United States *ex rel.* Hendow v. Univ. of Phoenix, 461 F.3d 1166 (9th Cir. 2006) (university violated FCA where it submitted claims to government while knowing that it was violating recruitment terms of its contracts); Varljen v. Cleveland Gear Co., Inc., 250 F. 3d 426, 430 (6th Cir. 2001) (court held that where contractor varied its method for producing gears from contract specifications without informing the government and then charged the government for the revised gears, it committed a false claim, stating: "The government's inspection and acceptance of a product do not absolve a contractor from liability for fraud under the FCA."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000) (contractor violated FCA when it submitted payment voucher while knowing that it breached a material term of the contract); Ab-Tech Constr., Inc. v. United States, 31 Fed. Cl. 429 (Fed. Cl. 1994), *aff'd,* 57 F.3d 1084 (Fed. Cir. 1995) (submission of payment vouchers, although containing no express representation, implicitly certified continued adherence to the eligibility requirements of the contract); Imperial Meat Co. v. United States, 316 F.2d 435, 441 (10th Cir. 1963) (finding false claim where contractor sought full payment for delivery of beef known to be non-conforming); Fallon, 921 F. Supp. at 622 (finding FCA liability where contractor sought payment for goods that it had not tested in compliance with contractual requirements). On this basis alone, RRC's argument as to Claim C should be rejected.

Thus, the allegations in the 2AC amply demonstrate that RRC's QMS violations resulted in false certifications: either express false certifications via the CoCs, 2AC ¶¶ 141-42, or implied false certifications because the QMS compliance is required under the contracts. 2AC ¶¶ 28-29, 98 (referencing FAR 52.246-2: "The Contractor shall provide and maintain an inspection system acceptable to the Government covering supplies under this contract and shall tender to the

27

Government for acceptance only supplies that have been inspected in accordance with the inspection system and have been found by the Contractor to be in conformity with contract requirements."). See also Def. Ex. 1 at 25 (incorporating FAR 52.246-2,4); Def. Ex. 2 at 7 (incorporating FAR 52.246-2,4); and Def. Ex. 3 at 8 (incorporating FAR 52.246-3,5).

RRC's last argument is that it should be dismissed regardless of the copious allegations of its QMS violations, and regardless of the fact that the contracts required compliance with the QMS, because Relators have not pleaded the particulars of any payments made as a result of the certifications. Def. Mem. at 24-25. This is a throwaway argument that RRC already lost in the Seventh Circuit. See Lusby, 570 F. 3d at 854. See also King 2011 WL 1884012, *1 (relator did not need to allege payment details when he described the particulars of the contractor's failure to test the goods);[10] Lockhart, 529 F. Supp. 2d at 1341 ("The complaint specifically identifies the tests that were not conducted, and gives precise and credible information on how Lockhart knows what he alleges. This is sufficient to satisfy Rule 9(b).").

Like Lusby, King, and Lockhart, Relators saw RRC violate its contracts and they have identified why those violations result in false claims.  There is no additional requirement for the Relators to have seen the claims themselves in order to allege that the claims were made.[11] In fact, the Lusby court specifically found that such a requirement would limit whistleblowers to the employees who work in a company's billing department and thus "take[] a big bite out of *qui*

---

[10]  Like McArtor and Ramsey, King was a quality control employee at the defendant's factory. Id. at *1. He alleged that the company charged for the defective grenades but had no knowledge of the specific bills. Id. As in Lusby, the court correctly held that the complaint met Rule 9(b), stating: "No party disputes the fact that the defendants billed for, and were paid for, their grenades." Id.

[11]  King, 2011 WL 1884012, *2, also explains why it is especially inappropriate to require a relator to identify specific bills in the defense fraud context: "[I]n the medical context, the harm to the government arises from the act of billing. . . . By contrast, improper quality control procedures in assembling military equipment distinctly harm the government entirely distinct from any financial impact."

*tam* litigation" without good reason. Id. The FCA was intended to encourage employees in the Relators' position to come forward when they see the type of violations at issue in this case.

### 3.    Reverse false claims (Claim B)

In addition to RRC's failure to follow the QMS manufacturing and testing requirements, McArtor pleads an equally serious and dangerous violation in which RRC covered up known defects and quality escapes from the government.

Starting in 2004, RRC began using a secret practice, which it called the "Records-Only MRB." 2AC ¶¶ 69-74. Contravening QMS requirements for disclosing known defects to the customer, RRC would classify certain defects as a "Records-Only MRB" if it believed that the defective product could still be used as-is in the field. Id. This violated the QMS because RRC was required to disclose all defects to the government and it had to use the QMS process (a regular Materials Review Board proceeding) to determine what parts in the field were potentially effected and whether the parts should be recalled. Id. Further, for all of the defects, RRC was required to compensate the government with replacement parts or a financial payment, even where the part could be used as is. Id. ¶¶ 65-67, 73.

RRC argues that the Records-Only MRB allegations should be dismissed from the case because Relator supposedly failed to plead that RRC made a "false record or statement" to conceal the defects. Def. Mem. at 20. RRC is correct about what the statute requires. A defendant must "make[], use[], or cause[] to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C.A. § 3729 (a)(7) (West 2008).[12] But RRC is mistaken when it says that

---

[12] RRC correctly points out that Relators again cite the wrong statutory provisions in the counts section of the 2AC. Counsel simply forgot to fix the statutory cites when it filed the 2AC. Counsel apologizes, but this error was inadvertent, and again, was not an attempt to avoid the requirement for pleading a "false record or statement" under Section (a)(7). To the contrary, Relators agreed in their prior response brief that the applicable statutory language is the one RRC cites in its brief. Dkt. No. 68, at 30 n.15. As before, Relators explain in the text accompanying this footnote that they pleaded several such false statements.

McArtor did not allege a false record or statement. Rather, it ignores and mischaracterizes a number of McArtor's allegations.

First, RRC made a false set of books concerning the quality escapes. 2AC ¶ 11. The records it disclosed to the government about quality escapes were kept in the customer-facing business unit ("CFBU"). 2AC ¶¶ 11, 136-37. This is where quality escape records are supposed to be kept and where the government auditors routinely go to look for them and review them. Id. However, RRC kept the documents about Records-Only MRBs in a different place: in the Operations department, concealed from the auditors. Id. By creating a separate set of books, the secret Records-Only MRB practice made the CFBU records false by omission. See Wilkins ex rel. United States v. State of Ohio, 885 F. Supp. 1055, 1064 (S.D. Ohio 1995) ("[A]n omission of information from records which are required to be maintained may constitute a false statement or record under the False Claims Act."). Indeed, RRC's very act of tendering incomplete records to the government, knowing that the government will assume them to be complete, is itself a false statement; and placing the records where the government auditors expect to look for them is a submission of the records to the government.[13]

Second, RRC made a false statement by failing to disclose the Records-Only MRB quality escapes at the program review meetings with the government's contract managers. 2AC ¶ 139. At the meetings, RRC would provide a purportedly complete review of contract performance and was expected to discuss outstanding quality escape issues, if any.[14] Id. Kleiner, who was well aware of the undisclosed quality escapes, id. ¶¶ 112-16, attended these meetings.

---

[13] RRC is simply wrong when it claims that Relators do not allege that RRC was required to maintain such records. Def. Mem. at 21. The 2AC cites a specific provision of the AS9100 standard, Section 4.2.4, which requires that RRC "establish and maintain records to demonstrate conformance with its QMS and make such records available for review by customers and regulatory authorities." 2AC ¶¶ 36, 98.

[14] Separately, RRC was also required by the QMS to disclose all quality escapes. 2AC ¶¶ 65, 73.

Id. ¶139. RRC's presentations were false by omission because they did not disclose the quality escapes in the Records-Only MRBs.

This concept of falsity is well-established in the common law. When a speaker omits material information that he is under a duty to disclose, the statement is implicitly false. See Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth."). This concept it is equally valid in FCA litigation. See United States v. Rogan, 517 F.3d 449 (7th Cir. 2008) (finding claim for payment for services to a patient is false where it omitted the fact that patient was referred under a kickback scheme, as the kickbacks were material information that made the claim ineligible for payment).

Third, Kleiner's lies to McArtor about the absence of quality escapes are also false statements. 2AC ¶¶ 78-79, 115, 138. RRC does not dispute these allegations. Instead, it argues that it is "implausible to believe" that any statements Kleiner made to him were intended to conceal, avoid or decrease an obligation to pay the government. Def. Mem. at 22. But this is not implausible at all, and certainly not so when construing the 2AC under the proper standard – i.e., as a whole and in the light most favorable to Relators.  Relators' allegations are sufficient:

> •2AC ¶¶ 54, 76: explaining that McArtor was the government's designated ODAR Coordinator; that the ODAR Coordinator is an employee of RRC but reports directly to the government; and further, that the ODAR Coordinator is responsible for monitoring quality control procedures within RRC and reporting compliance information to the government and, accordingly, "plays a crucial role in quality escape investigations";
>
> •2AC ¶ 65: In the event of a quality escape RRC must pay a concession to the government or give it a replacement;
>
> •2AC ¶ 68: "[W]anting to minimize expenses . . . associated with quality escapes, RRC decided to cut corners.  Its management team initiated two new practices that concealed quality escapes from government authorities";
>
> •2AC ¶ 70: The second of these two changes involved the creation of "Product Problem Resolution teams";

• 2AC ¶ 75-77: PPR teams replaced the CIT teams. The CIT teams included the ODAR (McArtor), but the PPR teams were made up of only top management;

• 2AC ¶¶ 78-79: Under the new PPR teams, McArtor (the ODAR) did not hear about any quality escapes for the whole first half of 2006. He twice asked Kleiner if there had been any (in May and August) and Kleiner twice told him that there had not. In fact Kleiner knew there were 35 quality escapes in that time.

Perhaps RRC will prove that Kleiner had absolutely no intent to prevent the government from learning about the quality escapes or that he intended to conceal the quality escapes information for some reason other than to avoid paying accommodations to the government. But Relator's allegations are more than sufficient at the pleadings stage to establish the requisite intent for a Section 3730(a)(7) claim. See Lusby, 570 F.3d at 855 ("To say that fraud has been pleaded with particularity is not to say that it has been proved. . . . Lusby's complaint may be wrong. . . . No complaint needs to rule out all possible defenses.").

Finally, RRC argues that Relators' reverse FCA claims are not viable because they "fail[] to identify any obligation by Rolls-Royce to pay a fixed sum." Def. Mem. at 23. But there is no such requirement. The cases RRC cites involve false statements made in contexts where there was no extant obligation to pay (as where a person lies to the government to avoid a fine that could later be levied against him by a criminal court). Here, by contrast, the contractor and the government have an existing contractual relationship with an existing obligation of payment at the time the false statements were made.

Thus, for example, the opinion RRC relies on, American Textile Manufacturers Inst. v. The Limited, Inc., 190 F.3d 729 (6th Cir. 1999), expressly distinguishes the facts before that court from those at bar, stating: "[Section] 3729(a)'s definition of 'obligation' certainly includes those arising from . . . breaches of government contracts."). 190 F.3d at 741; see also United States v. Pemco Aeroplex, Inc., 195 F.3d 1234, 1237 (11th Cir.1999) (en banc) (holding that a "specific, ongoing obligation during the life of the contract" gives rise to reverse false claims liability).

And in government contract cases, the fact that the amount of the payment obligation has not yet been liquidated is equally irrelevant. See United States ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1201 (10th Cir. 2006) (noting that Section 3729(a)(7) "refers to an 'obligation' and not 'a fixed obligation'"); Pemco Aeroplex, 195 F.3d 1237 (reverse false claims liability where amount of contractual obligation not yet determined at the time of the false statements).

In short, the 2AC contains sufficient allegations that RRC created false books and used false statements to conceal its obligation to compensate the government for known defects. These allegations are sufficient for Section (a)(7) liability. Accordingly, the court should not dismiss McArtor's Claim B.

**4.      False claims stemming from RRC's false statements during the re-certification (Claim D)**

Finally, RRC takes the position that it needs more details in order to respond to McArtor's claim that RRC lied to PRI investigators to obtain a re-certification of the QMS in 2006. But the allegations are more than adequate.

 McArtor has alleged who RRC lied to (PRI's AS9100 auditor); when the lie was told (following the T56 engine failures in 2004); what the lie consisted of (representations that RRC was following its QMS as written when, in fact, it was not following it); why the representations were false (listing the QMS and AS 9100 standards that were not being followed and identifying specific internal documentation of violations, including a 2004 internal audit report, that were not disclosed); and what RRC got by the lie (the AS 9100 recertification that DoD required for RRC to continue as a DoD contractor).  2AC ¶¶ 86-93. The Seventh Circuit expects no more of a fraud pleader.  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (a plaintiff should provide essentially the "first paragraph of any newspaper story.").

It is also hard to see what else RRC legitimately needs to prepare an effective response. It does not need a list of the contracts that it was in jeopardy of losing in order to respond to the

allegations that it lied to the PRI auditor and, regardless, McArtor already alleged which

contracts RRC was in jeopardy of losing: it was all of them. 2AC ¶¶ 86, 143. McArtor pleaded

the connection between the QMS recertification and RRC's ability to continue as a contractor.

Id. See also id. ¶ 3 (would-be contractors must have a quality system acceptable to the

government), ¶ 30 (the acceptable system is a pre-requisite to a contract award).[15]

     Further, listing all of the claims for payment under the fraudulently induced contract

would be a vain requirement that would not change RRC's response to the allegations one iota.

RRC is not going to claim that it performed the contracts for free; it obviously made claims for

payment. King, 2011 WL 1884012, *1. And all of the claims for payment under a contract that

was fraudulently induced are false claims as a matter of law. United States ex rel. Marcus v.

Hess, 317 U.S. 537, 542 (1943) (contractor committed false claims where it induced government

to award it a contract on less than the best price by engaging in a bid-rigging scheme; every

claim for payment under the contract was a false claim). Moreover, as discussed above, the

Seventh Circuit does not require a relator to plead details of payment. See Lusby, 570 F. 3d at

854. See also King, 2011 WL 1884012, at *1; Lockhart, 529 F. Supp. 2d at 1341.

     Finally, RRC also makes a cursory argument that McArtor's claim does not trigger FCA

liability because he only alleges a false statement to PRI, not the government. Def. Mem. at 18.

However, that argument takes an overly narrow view of FCA. Not surprisingly, courts do not

share RRC's narrow view of the Act.  "[L]iability will attach to each claim submitted to the

government under a contract, when the contract or extension of government benefit was

originally obtained through false statements or fraudulent conduct." Hendow, 461 F.3d at 1173

(citing Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999); United

---

[15] RRC again confuses the record by citing the example contract reference to higher-level standard including ISO 9001 ("or a comparable system"). Def. Mem. at 19.  As discussed at length above, RRC incorporated AS 9100 into its DoD-approved QMS and it was the QMS system that had to be recertified.

States *ex rel.* Marcus v. Hess, 317 U.S. 537, 542 (1943)). Indeed, as the 7th Circuit has explained, FCA liability attaches even where the connection between the fraudulent conduct and payment is indirect, so long as the fraudulent conduct is part of a causal chain leading to payment. Main, 426 F.3d at 916. ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); Hendow, 461 F.3d at 1177 (finding FCA liability where false statements to private lenders result in government payments).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's motion in its entirety.

UNITED STATES OF AMERICA *ex rel.*
THOMAS McARTOR and KEITH RAMSEY


By: _____/s/ Anand Swaminathan_____
Counsel for Relators Thomas McArtor
and Keith Ramsey

Arthur Loevy
Michael Kanovitz
Jon Loevy
Anand Swaminathan
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, Illinois 60607
(312) 243-5900

## **CERTIFICATE OF SERVICE**

      I, Anand Swaminathan, an attorney, certify that on December 23, 2011, I sent by CM/ECF electronic filing a copy of this Memorandum in Response to Defendant's Motion to Dismiss the Second Amended Complaint to counsel of record.


/s/ Anand Swaminathan
Attorneys for Plaintiff