UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* THOMAS McCARTOR and KEITH RAMSEY, <br><br> Relators/Plaintiffs, <br><br> v. <br><br> ROLLS-ROYCE CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) CASE NO.: 1:08-cv-00133-WTL-DML ) ) ) ) ) |

## Order on Discovery Dispute

The parties have a dispute regarding the scope of discovery that should be permitted in this *qui tam* case. In general, defendant Rolls-Royce Corporation argues that discovery in a *qui tam* case must be tied with exactitude to the specific matters the relators disclosed in their complaint as the bases for Rolls-Royce's alleged fraudulent claims for payment to the government. The relators counter that discovery in *qui tam* cases is governed by the same standards as discovery in all other cases in federal court. They maintain that their complaint provides only examples of the ways in which Rolls-Royce's conduct allegedly defrauded the government and that their case, and discovery, should not be limited to these examples only. Following a conference, the court directed the parties to submit briefs regarding their positions, which they have now done. The court now GRANTS IN PART and DENIES IN PART the relief requested in the filings at docket numbers 115, 118, and 119 as set forth in this Order.

As outlined below, the court is not persuaded that different discovery standards or policies should apply to *qui tam* cases. The court is concerned, however, that in this case and based on the nature of the allegations of the complaint that survived Rolls-Royce's motion to dismiss, there is high risk for discovery to outsize significantly its worth and impose unfair burden and expense, and to be used as the proverbial fishing expedition.

## Discovery Principles

Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . ." and "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." This language, added to Rule 26 in 2000, replaced language that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 350-51 (1978). In *Oppenheimer,* the Court observed that the phrase "relevant to the subject matter involved in the pending action" appropriately had been construed and applied quite broadly to permit discovery regarding "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case," including matters not directly tied to the merits of claims or defenses because "a variety of fact-oriented issues may arise during litigation that are not related to the merits." *Id.* at 351.

As some courts have explained, the 2000 amendments to Rule 26, though not altering the *scope* of discovery directed to the claims and defenses in a case, called special attention to the court's role in policing discovery and acting, on motion or its own initiative, to "limit the frequency or extent of discovery otherwise allowed" if the court determines that:

(i) the requested discovery is unreasonably cumulative or duplicative, or can be obtained in a different manner that is less burdensome or expensive;

(ii) the party seeking the discovery had, but did not take advantage, of other opportunities to obtain the information it seeks; or

(iii) the burden or expense of providing the requested discovery outweighs its likely benefit, "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the important of the discovery in resolving the issues."

*See* Rule 26(b)(2)(C)(i)-(iii).  *See also* Advisory Committee Notes to 2000 Amendments to Rule 26 (discussing the desire for "active judicial use" of its power under Rule 26(b)(2) "to control excessive discovery"); *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 681 (7th Cir. 2002) (internal quotations omitted) (although strong public policy favors disclosure of relevant materials, court should weigh "the value of the material sought against the burden of providing it and taking into account society's interest in furthering the truthseeking function in the particular

case before the court"); *Sanyo Laser Products, Inc. v. Arista Records, Inc.,* 214 F.R.D. 496 (S.D. Ind. 2003) (discussing 2000 changes to Rule 26, and concluding that the changes were not intended to alter the relevance standard for discovery but designed to focus courts on whether discovery, though relevant, is otherwise burdensome or excessive considering the needs of the case).

## Applying the Principles to this Case

The parties focus their arguments regarding the breadth of discovery appropriate for this case to interpretations of the word "claim" as used in Rule 26(b), which permits discovery relevant to a party's claim. Rolls-Royce argues that in a *qui tam* case the "claim" is limited to whatever very specific incidents of alleged fraud are described in the complaint; the Relators argue that their "claim" is not limited to specific incidents described in the complaint because those incidents are merely illustrative of the broader "claim" that their complaint describes and encompasses. In most litigation, a party's "claim" is susceptible of broad to narrow descriptions. So as an analytical touchstone, the court does not find it particularly helpful to focus on whether the "claim" can or should be described broadly or narrowly and then, having that description in hand, use it to dictate the scope of discovery.

The court is also not convinced that in *qui tam* cases a relator's claim should always be viewed "narrowly" for discovery purposes. Rolls-Royce has cited decisions, discussed below, in which some district courts in *qui tam* cases imposed stringent limits on discovery or suggested it was appropriate to do so, but none of

4

those decisions analyzes why *qui tam* cases should be governed by discovery rules or policies not applicable to other federal cases. And on closer examination, most of those decisions do not limit discovery in the manner Rolls-Royce urges here.

In *United States ex rel. Bane v. Breathe Easy Pulmonary Services,* 2008 WL 4057549 (M.D. Fla. Aug. 27, 2008), the court stated that "discovery in *qui tam* actions must be limited and tailored to the specificity of the complaint" and cited a district court case from the Northern District of Illinois (*Grandeau*) and one from the Eastern District of Louisiana (*Stewart*) as support for this statement. But neither *Grandeau* nor *Stewart* cited authority for subjecting *qui tam* cases to special discovery rules. Further, it does not appear that the ruling in *Bane* actually limited the relator to discovery regarding those specific instances of Medicaid and Medicare fraudulent billings described in the complaint. Rather, the court agreed with the defendants that discovery appropriately encompassed a six-year time period described in the complaint, billings involving four physicians identified in the complaint as having participated in the fraudulent billings, and billings involving the five specific medical clinics identified in the complaint. *Bane,* 2008 WL 4057549 at *2.[1]

---

[1] In other *qui tam* cases, discovery was not limited to the very specific financial transactions described in the complaint. See *United States ex rel. Regan v. Medtronic, Inc.,* 2000 WL 1478476 (D. Kan. 2000) (permitting discovery of transactions covering a five-year period within a particular sales district); *United States ex rel. Roberts v. QHG of Indiana, Inc.,* 1998 WL 1756728 at *9-10 (N.D. Ind. 1998) (permitting wide-ranging discovery directed to proof of a pattern of fraudulent billings).

5

*United States ex rel. Grandeau v. Cancer Treatment Centers of America,* 2003 WL 21504998 (N.D. Ill. June 30, 2003), did not decide any discovery issues. Rather, the district court's opinion addressed whether the relator's complaint satisfied Rule 9(b), and then referred the parties' discovery motions to the magistrate judge. *Id.* at *2.  Though the district court commented that a *qui tam* case "is not a roving commission to investigate all the financial dealings of the defendants," *id.,* that same comment may appropriately be made in any case in which the court is concerned that a party's discovery requests are designed not so much to prove claims adequately described in the complaint but to fish for new claims.  Indeed, the district judge in *Grandeau* also stated that the plaintiff was not expected to have pleaded every single factual circumstance comprising the fraudulent Medicare and Medicaid billing activity her complaint alleged the defendants had engaged in.  *Id.*

The magistrate judge in *United States ex rel. Stewart v. The Louisiana Clinic,* 2003 WL 21283944 (E. D. La. June 4, 2003), did limit the relator's discovery to the precise Medicaid or Medicare fraudulent patient billings she described in her complaint.  The magistrate judge did so based on a "clear message" from the district judge that the complaint had barely passed scrutiny under Rule 9(b), the district judge's prior warning to the relator that the judge would not allow discovery to be used as a "fishing expedition," and the district judge's belief that the case should concern only very specific matters about which the relator had independent knowledge of the fraud.  *Id.* at *3 and *9.

In *United States ex rel. Lusby v. Rolls-Royce Corp.,* Case No. 1:03-cv-680-SEB-WGH, *slip op.* at 2-3 (S.D. Ind. July 12, 2010), Magistrate Judge Hussmann addressed the temporal (but not substantive) scope of discovery, and limited discovery to events that occurred while the relator was still employed by Rolls-Royce because that was the only time frame during which the relator could have had "personal, direct, and independent knowledge of the substantive events." *Lusby,* Dkt. 179.

Magistrate Judge Hussmann's reference to "personal, direct, and independent knowledge," and the reference in *Stewart* to the relator's "independent knowledge of the fraud" harken to a subject matter jurisdictional requirement in the False Claims Act ("FCA")—the public disclosure rule and its original source exception under 31 U.S.C. § 3730(e)(4)—for *qui tam* cases that were filed before 2010.  (In 2010, an amendment to section 3730(e)(4) was passed by Congress as part of the Patient Protection and Affordable Care Act, Pub. L. 111-148, § 10104(j)(2), 124 Stat. 119, but the pre-2010 version applies to cases alleging wrongful conduct occurring before the amendment.  *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson,* 130 S.Ct. 1396, 1400 n.1. (2010)).  But having considered the history of the public disclosure rule and its original source exception and the purposes Congress intended them to fulfill, this magistrate judge finds these jurisdictional principles should *not* define the scope of discovery in *qui tam* cases.

The version of section 3730(e)(4) applicable to this case for jurisdictional purposes provides that a court is prohibited from exercising subject matter jurisdiction over a *qui tam* case that is "based upon the public disclosure of allegations or transactions" from specifically identified sources of public information *unless* the action is brought by an "original source of the information," which is defined as an individual "who has direct and independent knowledge of the information on which the allegations are based. . . ." This public disclosure rule with its original source exception was enacted in 1986, but was amended in 2010. *See Graham County,* 130 S.Ct. at 1400 and 1406-07 (providing a history of the FCA).

If it were true that every relator in a *qui tam* case must be an "original source" and that the definition of "original source" was static, then this magistrate judge might be convinced that *qui tam* cases should be governed by a special set of discovery principles. But these premises are not true. The original source rule applies only to *some qui tam* cases, and its meaning has shifted over time. Moreover, the history of the FCA indicates that Congress's concern with the base of knowledge underlying a relator's claims relates to its desire to provide the right mix of incentives for bringing to the federal government's attention information that it allegedly has been defrauded. *See Graham County,* 130 S.Ct. at 1411 (the public disclosure rule and its original source exception is Congress's creation of a "golden mean between an inadequate and an excessive scope for private enforcement"). It is not designed as a discovery rule.

In its original enactment in the 1860s during the Civil War, the FCA did not address the sources from which a relator could acquire information that formed the basis of his suit.  *Id.* at 1400 and 1406-07 (for history of the FCA).   In the 1930s, after the expansion of federally-funded government programs that could be defrauded, *qui tam* suits proliferated and relators began bringing suit—and obtaining judgment—based on nothing more than what they had copied from a federal criminal indictment.  In 1943, the Supreme Court held recovery in that circumstance was allowed under the statute.  *Id.* at 1406 (discussing *United States ex rel. Marcus v. Hess,* 317 U.S. 537 (1943)).  Congress reacted to the decision in *Hess* by amending the FCA to prohibit *qui tam* suits that were "based upon evidence or information in the possession of the United States" at the time the suits were commenced.  *Graham County,* 130 S.Ct. at 1406.  This amendment had the effect of stifling citizens from telling the government about fraud that was being practiced against it and otherwise thwarting "a significant number of potentially valuable claims."  *Id.* at 1407.

In 1986, Congress replaced the "government knowledge" bar to *qui tam* suits with the language of section 3730(e)(4) and its "public disclosure" bar, but with an exception to the public disclosure bar for a relator who is an "original source."  *Id.* Under this statutory scheme, a relator must be an "original source" in only one category of *qui tam* actions—those that are "based upon the public disclosure of allegations or transactions" in certain governmental proceedings identified in the statute or in the news media.  *Id.* at 1401 (the public disclosure bar in the pre-2010

9

version of the FCA "deprives courts of jurisdiction over *qui tam* suits when the relevant information has already entered the public domain through certain channels"). If the action is not based on public disclosure in any of the specific governmental proceedings (or in the news media) that the statute describes, then the original source requirement has no application.

In 2010, the Supreme Court in *Graham County* resolved a split among circuit courts of appeals over whether certain language of the public disclosure bar reflected Congress's intent that only disclosure in a *federal* administrative "report, hearing, audit, or investigation" fell under the bar, or whether disclosure in a like *state* administrative channel was public disclosure, thereby implicating the original source requirement. The Court held that Congress intended with its use of the term "administrative" in the second clause of the public disclosure rule to include state, as well as federal, administrative reports, hearings, audits, or investigations. *Id.* at 1411. In discerning Congress's intent regarding the precise channels of public disclosure that bar jurisdiction of a relator's action unless he or she is an original source, the Court said the statute includes "many ambiguities" and has a legislative history "spare, often incorrect, and wide-ranging enough to provide some support for almost any construction" of its ambiguities. *Id.* at 1407 n.15 (internal quotations and citation omitted). Indeed, in 2010 and before the Court decided *Graham County,* Congress amended the public disclosure rule and its original source exception in several significant ways: (1) it confined public disclosure to *federal* criminal, civil, or administrative hearings in which the *federal* government is a

10

party, to *federal* reports, hearings, audits, or investigations, and to the news media; (2) it changed the original source exception where the public disclosure bar arises to mean either a person who, prior to public disclosure, voluntarily disclosed to the government the information on which the allegations or transactions in a claim are based *or* "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided that information to the government before filing suit; and (3) it prohibited a court from dismissing an action based on publicly disclosed allegations and brought by a person who is *not* an original source if the government opposes dismissal, even though the government has not intervened.[2] In sum, under the 2010 amendment, the channels of public

---

[2] The current version of 31 U.S.C. §3730(e)(4) reads:
**(A)** The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

**(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

**(ii)** in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

**(iii)** from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

11

disclosure that trigger the original source requirement were narrowed, and the types of person qualifying as an original source were expanded, and with no express requirement that the basis of their knowledge be "direct." Even though, as a matter of the court's subject matter jurisdiction, the 2010 amendments do not apply to cases brought before the effective date of the amendments, the fact that Congress has found it necessary to continue to refine the public disclosure and original source provisions to reflect a "golden mean" for private enforcement heavily counsels against using these provisions for a purpose—defining the scope of discovery—that they were not designed to address.

With this history in mind, the court determines that it is not appropriate to graft an "original source" definition from the FCA onto the discovery rules for *qui tam* cases. Most importantly, the "original source" requirement applies to only a subset of all *qui tam* cases, and there would be no principled basis for limiting discovery in that subset of cases but not others. Moreover, the courts' and Congress's construction of "public disclosure" and "original source" have not been static and have turned on policies and principles totally unrelated to discovery. Thus, the court will adhere to the discovery rules and principles provided by the Federal Rules of Civil Procedure.

### Discovery Reasonably Necessary in this Case

The court now returns to the issue before it: What discovery is reasonably necessary for the relators' pursuit of their claims in this case?

In opposing Rolls-Royce's motion to dismiss their Second Amended Complaint, the relators urged Judge Lawrence to consider that their complaint pleaded "more than thirty specific examples of quality violations." Dkt. 87 at p. 7. The magistrate judge observes that some of these specific examples concern "quality escapes" or reporting requirements of product defect, but the claim in the SAC devoted to quality escapes (Claim B) was dismissed by Judge Lawrence for failing to satisfy Rule 9(b). (*See* Entry on Defendant's Motion to Dismiss, Dkt. 93, at pp. 12-13). It is not clear to the magistrate judge how, and whether, the allegations regarding defective parts remain relevant to the claims that Judge Lawrence has permitted to go forward. Those claims—Claim A and D—generally allege (and are supported by specific examples in the SAC) that (a) Rolls-Royce fraudulently induced the Department of Defense to enter into approximately 180 contracts between 2003 and 2006, when Rolls-Royce knew that it was not in compliance with a Quality Management System (QMS) that had been approved by the government in 2002 and had no intention to comply; and that (b) Rolls-Royce obtained AS9100 recertification in 2005 through false representations regarding its QMS program and quality practices, thus committing fraudulent inducement. In ruling that Claims A and D satisfied Rule 9(b) pleading standards, Judge Lawrence stated that that the SAC provides discrete examples of Rolls-Royce's noncompliance dating back to 2003. (Dismissal Order at p. 10)

Claim C, which generally concerned Rolls-Royce having certified its compliance with its government contracts every time it made a delivery under the

contracts, was dismissed because the SAC did not specify the falsity of particular certificates for particular contracts (and a certificate is not always required). (Dismissal Order at 14).  Even though Claim C was dismissed, the allegations underlying that claim were largely duplicative of those underlying Claim A (*see id.*). Its dismissal therefore does not materially affect the scope of discovery that reasonably should be permitted for Claims A and D.

The relators must be afforded reasonable discovery to prove Claims A and D, and the magistrate judge is convinced that limiting discovery only to the 30 or so specific examples of quality violations described in the SAC is not reasonable.  It is unreasonable, in this judge's view, to impose a limit on discovery and recovery in *qui tam* cases to specific examples of fraudulent behavior that relators were able to describe in their complaint when—as in this case—the complaint describes a general fact pattern of alleged fraudulent behavior supported by specific examples of that behavior.  The court sees no good reason to prevent a relator from discovering other examples of behavior substantially similar to those described in the complaint and that similarly fit the pattern of conduct on which the complaint is focused.

In a case like this one, however, which concerns a period of at least four years and alleged false claims under 180 contracts, discovery must hew closely to matters specifically described in the complaint lest discovery, because of its burden and expense, become the centerpiece of litigation strategy.  After studying the parties' arguments, case law, the operative complaint, the parties' briefing of Rolls-Royce's

motion to dismiss, and Judge Lawrence's decision on the dismissal motion, the court determines that a proposal by the relators—slightly modified—is appropriate.

The relators propose that Rolls-Royce produce summary-level Major Quality Failure Logs covering a period beginning May 2001 (or 18 months before Rolls-Royce entered into the first allegedly fraudulently-induced contract). The Relators then would identify quality violations that the relators contend are sufficiently similar to those described in their SAC such that more detailed discovery for those violations should be produced (such as an investigation file).

The court finds this proposal appropriate and orders Rolls-Royce to produce the summary-level MQF Logs for the period beginning May 2001. Rolls-Royce has 30 days to provide those summaries. The relators then have 30 days in which to identify for Rolls-Royce the quality violations for which they desire additional discovery. The parties must then confer (including an in-person meeting among counsel)[3] and—weighing relevance, burden, and expense—determine whether they can agree to more detailed discovery (and the extent of that detailed discovery) for any or all of the quality violations identified by the relators. If the parties cannot agree, they should jointly request a hearing.[4] Assertions regarding burden and expense, or the sufficiency of information Rolls-Royce has already agreed to

---

[3] The in-person meeting should take place after the parties have, through telephone discussion or writings, provided each other sufficient information about their positions so that an in-person meeting will be efficient and productive.

[4] In requesting a hearing, the parties should advise the court whether they wish to brief the issues. Given the fact-sensitive nature of these discovery issues, the court anticipates that briefing, if any, will be abbreviated. The issues will likely be better suited for oral argument/evidentiary hearing.

produce, must be supported by specific evidence. The court stresses, again, its concern that in this case there is high risk for discovery to significantly outsize its worth and impose unfair burden and expense.

As to the production of contracts, the court finds that Rolls-Royce is not required at this point to produce all 180 contracts, and their drafts, modifications, extensions, and associated contract negotiations and correspondence files. All of this information does not appear to be reasonably necessary, and the court imposes the following limits on that discovery:

1. Only contracts that contain FAR 52.246-11, and FAR 52.246-2, 3, 4, and 5 potentially are discoverable.

2. Rolls-Royce may select for production a sampling of the 180 contracts that contain one or more of the above FAR provisions. The sample must include at least 50 contracts.

3. Of those 50 contracts, the relators may select 10 of them for which they may obtain the production of drafts, modifications, and extensions, and may select 10 of them for which they may also obtain the production of contract negotiations and correspondence files. One or more in the second group of 10 can overlap with the first group of ten. In other words, if the relators desire, they can request the "full" production of drafts, modifications, extensions, contract negotiations, and correspondence files for the same 10 contracts—but they need not.

If, after reviewing and evaluating this discovery, the relators can demonstrate that it is insufficient, the relators may seek additional contracts discovery. If the parties cannot agree after meaningful discussion, they should seek a hearing.

## Conclusion

The court resolves the parties' discovery disputes addressed at Dkts. 115, 118, and 119 as set forth in this Order.

So ORDERED.

Date: 09/24/2013

Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system